## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NERO International Holding Co., Inc.
     and Joseph Valenti

        Plaintiffs,

     v.                            Case no.: 1:21-cv-11302

NEROtix Unlimited Inc.,
     Annemarie Tyler, William J. Bearden,
     and NERO World LLC.

        Defendants/Counter-Plaintiffs

_____/

## DEFENDANTS', NEROTIX UNLIMITED INC., & ANNEMARIE TYLER AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS TO PLAINTIFFS' FIRST AMENDED COMPLAINT

### LEAVE TO FILE GRANTED ON JUNE 9, 2022

Defendants, NEROtix Unlimited Inc. ("NEROtix") and Annemarie Tyler ("Tyler") (hereinafter jointly referred to as the "Defendants), by their undesigned counsel, hereby answer the First Amended Complaint of NERO International Holding Co., Inc. ("NIHC") and Joseph Valenti ("Valenti") (hereinafter jointly referred to as the "Plaintiffs"). In addition to answering the allegations of the Amended Complaint, Defendants also raise several defenses and counterclaims.

1.      To the extent paragraph 1 of the Amended Complaint contains allegations against the Defendants, Defendants deny the allegations.

**THE PARTIES**

2.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Amended Complaint and therefore deny the same.

3.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 of the Amended Complaint and therefore deny the same, except that Defendants admit that Joseph Valenti is an individual.

4.      Defendant, NEROtix, admits the allegations in Paragraph 4 of the Amended Complaint.

5.      Defendant, Tyler, admits she is an individual, residing at 56 Riverside Ave., Attleboro, Massachusetts 07703.

**JURISDICTION AND VENUE**

6.      Paragraph 6 of the Amended Complaint merely states a legal conclusion to which no response is required.

7.      Paragraph 7 of the Amended Complaint merely states a legal conclusion to which no response is required.

8.      NEROtix denies the allegations of having caused Plaintiffs any injuries and states that the remaining portion of the paragraph 8 merely state legal conclusions to which no response is required.

9.      Tyler denies the allegations of having caused Plaintiffs any injuries and states that the remaining portion of the paragraph 9 merely state legal conclusions to which no response is required.

2

10.     NEROtix admits that it regularly conducts business in Massachusetts and states that the remaining portion of the paragraph 10 merely state legal conclusions to which no response is required.

## FACTS COMMON TO ALL COUNTS

11.     Defendants deny that Live action role playing (LARP) refers to a single "dramatic and narrative interactive game" and that "The rules of the game dictate the world, characters, and action, thereby defining the universe of the game."  Defendants admit that a LARP is a genre of games that in any particular game participants physically act out scenarios, typically using costumes and props.

12.     Defendants deny the allegations contained in Paragraph 12 of the Amended Complaint.

13.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 13 of the Amended Complaint and therefore deny the same, except that Defendants admit that Mr. Ivey used the name RAVENHOLT as part of a LARP scenario.

14.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 14 of the Amended Complaint and therefore deny the same, except that Defendants deny that Mr. Valenti acquired any works subject to copyright from Mr. Ivey.

15.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 15 of the Amended Complaint and therefore deny the same.

16.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 16 of the Amended Complaint and therefore deny the same.

17.     Defendants deny the allegations in Paragraph 17 of the Amended Complaint.

18.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Amended Complaint and therefore deny the same.

19.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Amended Complaint and therefore deny the same.

20.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Amended Complaint and therefore deny the same.

21.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Amended Complaint and therefore deny the same.

22.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Amended Complaint and therefore deny the same.

23.     Defendants admit the allegations in paragraph 23 of the Amended Complaint.

24.     Defendants deny the allegations contained in paragraph 24 of the Amended Complaint.

25.     Defendants deny the allegations contained in paragraph 25 of the Amended Complaint.

26.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Amended Complaint and therefore deny the same.

27.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Amended Complaint and therefore deny the same.

28.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Amended Complaint and therefore deny the same, except that, on information and belief, Defendants admit that Mr. Ivy sold his business to Ms. Rachel Morris.

29.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 29 of the Amended Complaint and therefore deny the same.

30.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 30 of the Amended Complaint and therefore deny the same, except that, on information and belief, there appears to have been some type of agreement between NEROtix and NIHC the validity of which is in dispute.

31.     Defendants deny the allegations contained in paragraph 31 of the Amended Complaint, except that Defendants admit that the NEROtix was sold to Tyler.

32.     Defendants admit the allegations contained in paragraph 32.

33.     Defendants admit the allegations contained in paragraph 33 of the Amended Complaint.

34.     Defendants deny the allegations contained in paragraph 34 of the Amended Complaint.

35.     Defendants admit the allegations contained in paragraph 34 of the Amended Complaint.

36.     Defendants admit the allegations in paragraph 36 of the Amended Complaint and therefore deny the same.

37.     Defendants admit the allegations contained in paragraph 37 of the Amended Complaint.

38.     Defendants deny the allegations contained in paragraph 38 of the Amended Complaint, except that Defendants admit that a license agreement was terminated.

39.     Defendants are without information sufficient to form a belief as to  the truth of 8the allegations in paragraph 39 of the Amended Complaint and therefore deny the same.

40.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 40 of the Amended Complaint and therefore deny the same.

41.     Defendants deny the allegations contained in paragraph 41 of the Amended Complaint.

42.     Defendants deny the allegations contained in paragraph 42 of the Amended Complaint expect that Defendants continue to use the trademark RAVENHOLT in connection with their services.

43.     Defendants deny the allegations contained in paragraph 43 of the Amended Complaint except that Defendants admit that NEROtix continues to use the trademarks RAVENHOLT and NERO  in connection with their services and that there is no affiliation with Plaintiffs.

44.     Defendants deny the allegations contained in paragraph 44 of the Amended Complaint.

45.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 45 of the Amended Complaint and therefore deny the same.

46.     Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Amended Complaint and therefore deny the same.

47.     Defendants deny the allegations contained in paragraph 47 of the Amended Complaint except that Defendants continues to use the RAVENHOLT and NERO trademarks to offer services.

## COUNT I

48.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 47 as is fully set forth herein.

49.     Defendants deny the allegations contained in paragraph 49 of the Amended Complaint except that Defendants admit that the RAVENHOLT and NERO trademarks are used in connection with running the RAVENHOLT chapter and offering services.

50.     Defendants deny the allegations contained in paragraph 50 of the Amended Complaint except that Defendants admit that the RAVENHOLT chapter continues to  charge for events and solicit revenue.

51.     Defendants deny the allegations contained in paragraph 51 of the Amended Complaint.

52.     Defendants deny the allegations contained in paragraph 52 of the Amended Complaint.

53.     Defendants deny the allegations contained in paragraph 53 of the Amended Complaint.

54.     Defendants deny the allegations contained in paragraph 54 of the Amended Complaint.

55.     Defendants deny the allegations contained in paragraph 55 of the Amended Complaint.

56.     Defendants deny the allegations contained in paragraph 56 of the Amended Complaint.

57.     Defendants deny the allegation contained in paragraph 57 of the Amended Complaint.

## **COUNT II**

58.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 57 as is fully set forth herein.

59.     Defendants deny the allegations contained in paragraph 59 of the Amended Complaint.

60.     Defendants deny the allegations contained in paragraph 60 of the Amended Complaint.

61.     Defendants deny the allegations contained in paragraph 61 of the Amended Complaint.

62.     Defendants deny the allegations contained in paragraph 62 of the Amended Complaint.

63.     Defendants deny the allegations contained in paragraph 63 of the Amended Complaint.

64.     Defendants deny the allegations contained in paragraph 64 of the Amended Complaint.

## COUNT III

65.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 64 as is fully set forth herein.

66.     Defendants deny the allegations contained in paragraph 66 of the Amended Complaint.

67.     Defendants deny the allegations contained in paragraph 67 of the Amended Complaint.

68.     Defendants deny the allegations contained in paragraph 68 of the Amended Complaint.

69.     Defendants deny the allegations contained in paragraph 69 of the Amended Complaint.

## COUNT IV

70.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 69 as is fully set forth herein.

71.     Tyler admits the allegation contained in paragraph 71 of the Amended Complaint.

72.     Tyler denies the allegations contained in paragraph 72 of the Amended Complaint.

73.     Tyler denies the allegations contained in paragraph 73 of the Amended Complaint.

74.     Tyler denies the allegations contained in paragraph 74 of the Amended Complaint.

75.     Tyler denies the allegations contained in paragraph 75 of the Amended Complaint.

76.     Tyler denies the allegations contained in paragraph 76 of the Amended Complaint.

77.     Tyler denies the allegations contained in paragraph 77 of the Amended Complaint, except that Tyler admits that she submitted a Declaration of Use under Section 8 of the Lanham in which she claimed continued use of the mark in commerce,

78.     In response to paragraph 78, Tyler admits that she has evidentiary support of the continued use of the mark in commerce.

79.     Defendants deny the allegations in paragraph 79 of the Amended Complaint.

80.     Defendants deny the allegations contained in paragraph 80 of the Amended Complaint.

81.     Defendants deny the allegations contained in paragraph 81 of the Amended Complaint.

82.     Defendants are without information sufficient to form a belief as to  the truth of the allegations in paragraph 82 of the Amended Complaint and therefore deny the same.

83.     Defendants deny the allegations contained in paragraph 83 of the Amended Complaint.

84.     Defendants deny the allegations contained in paragraph 84 of the Amended Complaint.

85.     Defendants deny the allegations contained in paragraph 85 of the Amended Complaint.

## **COUNT V**

86.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 85 as is fully set forth herein.

87.     Defendants deny the allegations contained in paragraph 87 of the Amended Complaint.

88.     Defendants deny the allegations contained in paragraph 88 of the Amended Complaint, except that Defendant admit that it maintains a domain-name registration for the domain-name. www.neormass.com.

89.     Defendants deny the allegations contained in paragraph 89 of the Amended Complaint.

90.     Defendants deny the allegations contained in paragraph 90 of the Amended Complaint.

91.     Defendants deny the allegations contained in paragraph 91 of the Amended Complaint.

92.     Defendants deny the allegations contained in paragraph 92 of the Amended Complaint.

93.     Defendants admit the allegations contained in paragraph 93 of the Amended Complaint.

94.     Defendants deny the allegations contained in paragraph 94 of the Amended Complaint.

95.     Defendants deny the allegations contained in paragraph 95 of the Amended Complaint.

## COUNT VI

96.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 95 as is fully set forth herein.

97.     Defendants deny the allegations contained in Paragraph 97 of the Amended Complaint.

98.     Defendants deny the allegations contained in paragraph 98 of the Amended Complaint, except that NEROtix admits that copies of certain works are  available on its website.

99.     Defendants deny the allegations contained in paragraph 99 of the Amended Complaint.

100.    Defendants deny the allegations contained in paragraph 100 of the Amended Complaint.

101.    Defendants deny the allegations contained in paragraph 101 of the Amended Complaint.

## COUNT VII

102.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 101 as is fully set forth herein.

103.     Defendants deny the allegations contained in paragraph  103 of the Amended Complaint.

104.     Defendants deny the allegations contained in paragraph 104 of the Amended Complaint.

105.     Defendants deny the allegations contained in paragraph 105 of the Amended Complaint.

106.     Defendants deny the allegations contained in paragraph 106 of the Amended Complaint.

## COUNT VIII

107.     Defendants repeat and re-allege each of the answers in paragraphs 1 - 106 as is fully set forth herein.

108.     Defendants deny the allegation that the agreement contains "anticompetition clauses," but admit the rest of the allegations contained in paragraph 108 of the Amended Complaint.

109.     Defendants deny the allegations contained in paragraph 109 of the Amended Complaint, except that Defendants admit that they are continuing to offer services.

110.     Defendants deny the allegations contained in paragraph 110 of the Amended Complaint.

111.     Defendants deny the allegations contained in paragraph 111 of the Amended Complaint.

112.    Defendants deny the allegations contained in paragraph 112 of the Amended Complaint.

## COUNT IX

113.    Defendants repeat and re-allege each of the answers in paragraphs 1 - 112 as is fully set forth herein.

114.    Defendants admit the allegations contained in paragraph 114 of the Amended Complaint.

115.    Defendants deny the allegations contained in paragraph 115 of the Amended Complaint.

116.    Defendants deny the allegations contained in paragraph 116 of the Amended Complaint.

117.    Defendants deny the allegations contained in paragraph 117 of the Amended Complaint.

118.    Defendants deny the allegations contained in paragraph 11 of the Amended Complaint.

## AFFIRMATIVE DEFENSES

Defendants set forth the following additional defenses without assuming the burden of proof as to any such defense.

## FIRST AFFIRMATIVE DEFENSE

Defendants trademark registration and other intellectual property are valid and entitled to protection.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs fail to state a cause of action on which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrines of laches, estoppel, waiver, and

acquiescence.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Defendants have priority of use over any use of the marks that are the subject of this

litigation.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part due to its inequitable conduct.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs have not suffered

any actual injury or damage.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' state claims are barred, in whole or in part, to the extent Plaintiff cannot

obtain protection under state unfair competition law for areas pre-empted by federal legislation.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs cannot claim exclusive rights in Plaintiffs' marks, to the extent that Plaintiffs

own any marks, and/or have abandoned or lost their rights in those marks, because Plaintiffs

have misused their mark(s), and/or has failed to use their mark(s) in a manner consistent with

its/their application, and/or has failed to use their mark(s) consistently in connection with the

14

particular goods and/or services, and/or has failed to use their mark(s) in a manner consistent with the requirements of law and proper procedure necessary to acquire such rights.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs cannot claim exclusive rights in Plaintiffs' mark(s) and/or has abandoned or lost its rights in those marks, because the term is a widely used mark that has become diluted by third party uses of the term.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs cannot claim exclusive rights in Plaintiffs' mark(s) and/or has abandoned or lost its rights in those marks, because Plaintiffs have failed to police their marks.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs cannot claim any rights in any intellectual property as Plaintiffs did not own any rights in the property claims, or any rights that they had were abandoned.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs cannot claim exclusive rights in Plaintiffs' mark(s) and/or has abandoned or lost its rights in those marks.

## FOURTEENTH AFFIRMATIVE DEFENSE

Any decrease in membership in any organization run by Plaintiffs is attributable to Plaintiffs' belligerent, demeaning, fraudulent and abusive behavior.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs are not the authors of the works in which they claim ownership as the works were either 1.) derivative works, 2.) collective works; and/or 2.) works of joint authorship and Plaintiffs do not have assignments from the  authors of the works.

## SIXTEENTH AFFIRMATIVE DEFENSE

The copyright registrations obtained by Plaintiffs were obtained by misrepresenting the authorship of the works to the United States Copyright Office.

## SEVENTEENTH AFFIRMATIVE DEFENSE

There is no privity of contract between Plaintiffs and Defendants.

## EIGHTEENTH AFFIRMATIVE DEFENSE

In the event that it is determined that a contract existed between Defendants Tyler and/or NEROtix and Plaintiffs, Plaintiffs fraudulently induced the Defendants into entering the contract.

## NINTEENTH AFFIRMATIVE DEFENSE

In the event that it is determined that a contract existed between Defendants Tyler and/or NEROtix and Plaintiffs, Plaintiffs released them from such contract.

## TWENTETH AFFIRMATIVE DEFENSE

In the event that it is determined that a contract existed between Defendants Tyler and/or NEROtix and Plaintiffs, Plaintiffs expressly repudiated the agreement.

## TWENT-FIRST AFFIRMATIVE DEFENSE

In the event that it is determined that a contract existed between Defendants Tyler and/or NEROtix and Plaintiffs, Plaintiffs waived any claims by not bringing relevant claims in a timely manner.

## ADDITIONAL DEFENSES

Defendants expressly reserve the right to assert further defenses as may be revealed during discovery, including but not limited to defenses based upon after-acquired evidence.

## COUNTERCLAIMS

Defendants  and  Counterclaimants, NEROtix Unlimited Inc. ("NEROtix") and Annemarie Tyler ("Tyler") (jointly referred to herein as the "Defendants,") allege  the following  counterclaims  against  Plaintiffs  and  Counter-defendants,  NERO International Holding Co., Inc. ("NIHC") and Joseph Valenti ("Valenti") (hereinafter jointly referred to as the "Plaintiffs").

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Live action role playing ("LARP") is an international activity.

2.      According to Wikipedia, a live action role-playing game (LARP) is a form of role-playing game where the participants physically portray their characters.[1] The players pursue goals within a fictional setting represented by real world environments while interacting with each other in character. The outcome of player actions may be mediated by game rules or determined by consensus among players. Event arrangers called gamemasters decide the setting and rules to be used and facilitate play. The first LARPs were run in the late 1970's, inspired by tabletop role-playing games and genre fiction. The activity spread internationally during the 1980's and has diversified into a wide variety of styles. Play may be very game-like or may be more concerned with dramatic or artistic expression. Events can also be designed to achieve educational or political goals. The fictional genres used vary greatly, from realistic modern or historical settings to fantastic or futuristic eras. Production values are sometimes minimal but can involve elaborate venues and costumes. LARPs range in size from small private events lasting a few hours, to large public events with thousands of players lasting for days.

3.      LARP does not have a single point of origin but was invented and developed independently by groups in North America, Europe, and Australia.

4.      Likewise, groups are free to change, revise, embellish or delete contents of a particular game as they wish.

5.      Rules, to the extent any exist, are more like guidelines than actual rules. In some games while other games can be more rule oriented.

6.      At some point in 1986,  the organization that was to become NERO began under the name "Weekend Warriors" by Ford Ivey (Ivey"9).

7.      Ivey was inspired to create the Weekend Warriors by the New Hampshire LARP game entitled "Midrealms Adventurer."

8.      The name "NERO" was created by Craig Walton (Ventrella Aff., ¶7, a true and accurate copy is attached hereto as **Exhibit A**.)

9.      The NERO game was created by a team of people known as the "dirty dozen." The members were Ken Ames, Mark Ginnetty, Sean Griffin, Beth Griffin, Lori Goldey, Heidi Hooper, Dave Jodoin, Bab King, Randy Pierce, Craig and Debbie Walton and Michael Ventrella. (Ventrella Aff., ¶8)

10.      At some point, Ivey formed the company NERO International, Inc.

11.      According to the NERO International Wikipedia site, https://en.wikipedia.org/wiki/NERO_International#The_Tyrran_Campaign_Setting, the "setting of NERO is the world of Tyrra, a medieval fantasy world.

12.      The Duchy of Ravenholt is merely one of many locations in the story.

13.      On information and belief, the term RAVENHOLT was created by an unknown person to designate a fictional kingdom in the "Midrealms Adventure" game.

14.      According the NERO International Wikipedia page (https://en.wikipedia.org/wiki/NERO_International#The_Tyrran_Campaign_Setting),  "In fall of

1989 they changed their name to the New England Role Playing Organization and began to operate larger events using rules written by Michael A. Ventrella."

15.     Michael A. Ventrella ("Ventrella"), was not an employee of either the New England Role Playing Organization or Ivey.

16.     Ventrella never assigned ownership of his copyrightable interests (Ventrella Aff., ¶35) .

17.     Ventrella wrote and edited the 1st Edition of the rule book in 1989, entitled NEW ENGLAND ROLEPLAYING ORGANIZATION PLAYERS HANDBOOK (Ventrella Aff., ¶35)

18.     A true and accurate copy of the first edition of that rule book is attached  to the Ventrella affidavit as **Exhibit A** and designated with the Bates numbers DT003155 – DT003248. Ventrella is listed as the head of the Plot Committee on the staff listing in the back of the book ((Ventrella Aff., ¶10)

19.     In the years following the publishing of the first edition of the rule book, other editions of the rule books were issued. ((Ventrella Aff., ¶¶ 16, 19, 22, 24, 30, 34)

20.     True and accurate copies of the Rule Books are attached to the Ventrella Affidavit as Exhibits A, B, C, D, E, F, H, I,  J, K.

21.     At some point in 1997, Plaintiff, Joseph Valenti acquired the computer files for the rule book from Ventrella and issued a version of the rule book that is also designated as the 8th  edition. (Ventrella Aff., ¶32)

22.     In that version of the rule book, Ventrella's name as editor and founder was removed, although the version of the rule book was essentially the same as the editions Ventrella

wrote and edited and used Ventrella's original work as the template for the layout. (Ventrella Aff., ¶¶33 and 36)

23.    Ventrella never assigned any rights in the materials that he created to either Joseph Valenti or any entity. (Ventrella Aff., ¶¶ 35, 43)

24.    At no time was Joseph Valenti ever a creative force in the game regarding the rules or the plot of the game. (Ventrella Aff., ¶¶ 43)

25.    At no time did Joseph Valenti contribute any materials to any of the rule books. (Ventrella Aff., ¶¶ 44)

26.    Ventrella is the owner of the United States Copyright registration number TX0003738607, registered January 18, 1994, Title: NERO, New England Roleplaying Organization : player's guide. Description:   1 v. Copyright Claimant: Date of Creation: 1993). (A true and accurate copy of the Copyright Office records is attached hereto as **Exhibit B**)

27.    Ventrella is the owner of the United States Copyright registration number TX0005217035, registered May 11,  2000, Title: New England Roleplaying Organization: player's guide, Ashbury campaign/edited by Michael A. Ventrella; written by the Ashbury Plot Committee; ill. by Eric Hamilton, Steve McAndrews, Alex Morrissey, Atsutoshi Nakazato and Max Steinmetz; photos by Bob Cook, Mike Ventrella, and Max Steinmetz. (A true and accurate copy of the Copyright Office records is attached hereto as **Exhibit C**)

28.    Ventrella is the owner of the United States Copyright registration number TX0006107620, registered March 1, 2005, for the NERO rule book : New England roleplaying – Alliance Edition, 3.0 ( A true and accurate cop of the Copyright Office records for the registration is attached hereto as **Exhibit D**).

29.     In the beginning of 2011, the 9th Edition of the Rule Book was issued, containing the contributions from David Epstein,  Noah Mason, Dan Comstock, Nick Denny, and Michael Golosovker. (Golosovker Aff., ¶22,  a true and accurate copy is attached hereto as **Exhibit E.** A true and accurate copy of one version of the 9th Edition is attached as Exhibit A to the Golosovker affidavit.)

30.     The 9th edition of the Rule Book was based on the 8th edition of the rule book. (Golosovker Aff., ¶¶ 6, 25)

31.     Golosovker never assigned, or agreed to assign, any of the material or works that he created in connection with the 9th Edition to anyone and specifically not to Joseph Valenti, or any organization associated with Valenti. (Golosovker Aff., ¶ 23)

32.     When the twelve founders, the so called  "dirty dozen," created the LARP game scenario for the first New England Role Playing Organization role playing event in 1988 and 1989, the twelve founders voted that, as an homage to the great actor, Basil Rathbone, and in particular his character in the 1955 film "Court Jester" (Rathbone's character's name was Sir Reavenhurst), the name of their fictious Duchy would be "Duchy of Ravenholt."

33.     The use of the term RAVENHOLT in the scenario was merely a vehicle for telling a story.

34.     The New England Role Playing Organization never owned any copyrights in any work, as the game scenarios and rules were all created by individuals who compiled their work.

35.     On information and belief, the Barbarian Race Package was primarily created by Florence Pyne. She was assisted by Fran Moore and Deb Blanchard.

36.     On information and belief, the Dwarven Package was created by Mark Prenetta, Bob King and Grubb.

37.     On information and belief, the Gypsy Package was originally created by Fran Moore. She was assisted by Florence and Lori Goldy (who is now legally named Jet Cutir).

38.     On information and belief, a couple of years after the creation of the initial Gypsy package, the Gypsy Package was redone with help from Selina Harvey.

39.     None of the above-mentioned individuals were employed by the New England Role Playing Organization or Ivey.

40.     On information and belief, none of the above-mentioned individuals ever assigned any of their contributions to anyone.

41.     On information and belief, neither New England Role Playing Organization, Ivey or Ventrella obtained any rights to the contributions of any of the contributors to any works.

42.     NERO International Holding Co., Inc., had no employees prior to its dissolution in 2002.

43.     NERO International Holding Co., Inc., does not have ownership of any work created by any employees.

44.     Valenti claims ownership in works that he acquired by assignment.

45.     The persons who allegedly assigned their works to Valenti were merely contributors to compiled works.

46.     If the Copyright Office had been aware of the facts regarding the creation of the works identified in the Amended Complaint registered to Valenti, the Copyright Office would not have issued the registrations to him.

47.     At no time did New England Role Playing Organization, Ivey or Ventrella ever use the term RAVENHOLT as a trade or service mark.

48.     The New England Role Playing Organization never operated any events itself.

49.     New England Role Playing Organization merely sanctioned events and provided sets of gaming rules that were compiled from various contributors.

50.     On August 17, 1999, the United States Patent and Trademark Office issued a registration for the mark NERO, registration number 2,270,409 to Nero International Inc.

51.     Allegedly, a sale of the New England Role Playing Organization from Ivey to Valenti occurred in 1998.

52.     On August 3, 1998, Ivey allegedly executed an assignment document assigning the trademark NERO to NERO International Holding Co., Inc.

53.     The assignment document was recorded with the United States Patent and Trademark Office on April 14, 2005, at Reel 003066 Frame 0929. A true and accurate copy of the trademark assignment document is attached hereto as **Exhibit F**.

54.     The cover sheet and the assignment itself reflect an execution date of August 3, 1998.

55.     According to the recorded assignment identified in paragraph 52 above, Ivey "adopted and used the NERO® trademark, which was applied for January 20, 1998, and registered with the U.S. Patent and Trademark Office, No. 2270409, ***dated 8/17/1999***" (emphasis added).

56.     This document is clearly a fraudulent, back-dated document, as no one could have known in 1998 that the mark "was registered" in 1999.

### NIHC I IS CREATED AND DISSOLVED

57.     According to the corporate records at the New York Department of State Corporations Division,  on July 24, 1998, Valenti formed the first company designated as "NERO  International Holding Co., Inc.," (hereinafter referred to as "NIHC I").

58.     A true and accurate copy of the New York Department of State Corporations Division's website showing the date of the formation of  NIHC I on July 24, 1998, is attached hereto as **Exhibit G**.

59.     According to the corporate records at the New York Department of State Corporations division,  NIHC I was dissolved on June 26, 2002. (Defendants' **Exhibit G**)

60.     Valenti abandoned this corporation without the intent to revive the corporation.


## NIHC II IS CREATED AND DISSOLVED

61.     According to the corporate records at the New York Department of State Corporations division, Valenti formed a second NERO  International Holding Co., Inc., on February 25, 2005 ("NIHC  II"). (Defendants' **Exhibit H**)

62.     According to the corporate records at the New York Department of State Corporations division NIHC II was dissolved on April 27, 2011. (Defendants' **Exhibit H**)


## NIHC I IS RESURRECTED

63.      The corporate records at the New York Department of State Corporations division reflect that the dissolution of NIHC I was annulled, and the corporation was reinstated on February 10, 2017. (Defendants' **Exhibit G**).


## NERO LIVE ADVENTURE GAMES LLC

64.     In 2014, Valenti filed an action in the County Civil Court at Law No.3, Harris County, TX, docket number 1048065 against  Jason Aydelotte.

65.     In that action, Valenti represented that the was the owner of NERO Live Adventure Games, L.L.C.

66.     NERO Live Adventure Games L.L.C., is also named as a party to Cancellation number 92065883, currently pending before the Patent and Trademark Office Trademark Trial and Appeal Board.

67.     The Cancellation Action 92065883 was filed against Bearden with the Trademark Trial and Appeal Board on April 13, 2017.

68.      In fact, NERO Live Adventure Games, L.L.C. , never existed.

69.     Although NERO Live Adventure Games, L.L.C. never existed, Valenti represented that that entity had rights.


**NERO LIVE ADVENTURES GAMES LLC**

70.     On or about 2014, Joseph Valenti, DBA NERO, issued a copy of the NERO Rule Book in which the following language appeared:  "THE NERO name and logo is a registered trademark of NERO ©  Live Adventures Games, L.L.C."  A copy of this Rule Book showing the referenced language is attached hereto as **Exhibit I**.

71.      At that time, there was no entity known as NERO Live Adventures Games, LLC, nor was there any trademark registration owned by that entity.

72.     At some point after the issuance of the 9th edition of the NERO Rule Book reflecting NERO Live Adventure Games, LLC as the owner of a registration for the "name and logo," the rule book was changed to state "The NERO name and logo is a ~~registered~~ trademark of NERO International Holding co., Inc."

73.     Since no NERO Live Adventures Games LLC (or NERO Live Adventure Games LLC) ever existed, NERO International Holding co., Inc., cannot have acquired any rights from such entity.

### NERO TRADEMARK REGISTRATION EXPIRES

74.     Upon the dissolution of both NIHC I and NIHC II, any trademarks owned by the respective companies terminated.

75.     In particular, the federal trademark registration 2,270,409 for the mark NERO expired on March 20, 2010. A true and accurate copy of the Patent and Trademark Office records reflecting the status of NERO mark is attached hereto as Defendants' **Exhibit J**.

76.     Although NIHC I had ceased to exist in 2002, Valenti fraudulently represented to the Patent and Trademark Office on May 10, 2005, that NIHC I was still active.

77.     Furthermore, after the dissolution of NIHC I, Valenti continued to represent to third parties, including the Defendants,  that NIHC I,  existed, and that it had a valid trademark registration.

78.     Valenti continued to use the "®" symbol after the mark had been abandoned.

79.     On information and belief, there were never any assignments of any intellectual property between NIHC I and Valenti.

80.     On information and belief, there were never any assignments between Valenti and NIHC II,  or NIHC II and the reincarnated NIHCI.

81.     Valenti was not the sole shareholder of NIHC I.

82.     Valenti stated that he awarded shares in NIHC I to others.

83.     In spite of the fact that Valenti owned no intellectual property rights, he continued to represent that he or one of his companies, whether fictious or real,  did indeed have some

intellectual property for the purpose of inducing others to enter "license agreements" with him and/or his companies.

84.     Although Ivey allegedly entered into an agreement with Valenti to sell the New England Role Playing Organization, Ivey maintained control and ownership of the Massachusetts chapter, running events through 1998, 1999, and part of 2000.

85.     On or about July 1, 2000, Ford Ivey allegedly sold the operation and management of the Massachusetts chapter of NERO International, Inc., to Rachel Morris.

86.     On August 19, 2000, Valenti, acting as President of NERO acknowledged this sale to Rachel  Morris ("Morris").

87.     Valenti then demanded, under threat of legal action against Morris, that Morris declare her agreement with the New England Role Playing Organization to be void and demanded that she take a license from him.

88.     On information and belief, neither Ivey nor the New England Role Playing Organization repaid to Morris the consideration that she paid for acquiring the New England chapter from the New England Role Playing Organization.

89.     On information and belief, neither Valenti or NERO I acquired any rights to the Massachusetts chapter from Ivey or the New England Role Playing Organization.

90.     On information and belief, neither Ivey or the New England Role Playing Organization assigned any copyrights or trademarks to Valenti and/or NERO I at any time.

91.     Ivey and/or the New England Role Playing Organization could not possibly have assigned any copyrights to Valenti and/or NERO I as Ivey and/or the New England Role Playing Organization did not possess any copyrights to assign, especially and in particular, not to the copyrights identified by the Plaintiffs in their Amended Complaint.

92.     Valenti knowingly interfered with the contractual relationship between Morris and Ivey/the New England Role Playing Organization, when he induced her to "void" her agreement with Ivey/the New England Role Playing Organization.

93.     On information and belief, Valenti knowingly misrepresented to Morris that he was the rightful owner of the Massachusetts Chapter and that she must agree to a license with him.

94.     By virtue of Valenti's misrepresentations to Morris, any agreement between Valenti and Morris was void *ab initio*.

95.     Morris formed the NEROtix Unlimited, Inc. ("NEROtix) with the Commonwealth of Massachusetts on September 26, 2000.

96.     On information and belief, NEROtix entered into a license agreement with NIHC I after Valenti knowingly misrepresented to NEROtix's owner that only NIHCI could grant a license to use copyrighted materials and trademarks allegedly owned by NIHC I.

97.     NEROtix operated and managed the Massachusetts chapter, until NEROtix was sold to Annemarie Tyler ("Tyler") in 2009.

98.     After Tyler acquired the ownership in NEROtix, Valenti continued to misrepresent that he or NIHC I owned copyrights and other intellectual property for which Tyler must pay license fees.

99.     Valenti knowingly and falsely represented that NIHC I or NIHC II owned copyrights and other intellectual property to induce NEROtix to enter into an agreement with him.

100.     Because Valenti knowingly and falsely made representations to NEROtix to induce NEROtix to enter into an agreement, said agreement is void *ab initio*.

101.     Because of Valenti's misrepresentations, NEROtix continued to operate under the assumption that it had a valid licensing agreement with an organization known as NERO.

102.     At least as early as January 1, 2009, Tyler conceived of the trademark RAVENHOLT and began using the mark to designate the entertainment services offered by the NEROtix.

103.     Tyler filed an application for registration of the mark with the United States Patent and Trademark Office and a registration for the mark, registration number 4,973,167 was issued to her.

104.     Tyler permitted NEROtix to continue to use the RAVENHOLT mark.

105.     NEROtix continues to use the mark to market its services.

106.     No other person or entity has valid trademark rights to the term RAVENHOLT to designate goods and/or services.

107.     Prior to Tyler's adoption and use of the term as a trademark, no other person used the name as a trademark to designate services.

108.     NERO terminated the license agreement with NEROtix because NEROtix refused to pay Valenti additional fees allegedly incurred by Morris when Morris sold her ownership interests to Tyler.

109.     Plaintiffs continue to represent that they are the owners of copyrights and/or trademarks to which they have no rights.

110.     Plaintiffs are unlawfully using the term RAVENHOLT to designate services similar or identical to those offered by NEROtix.

111.     NEROtix has not permitted Valenti or NERO to use the mark.

112.     Ford Ivey granted the right to use NERO to other individuals to open other chapters of the NERO game. (Ivey Aff. ¶ 4, A true and accurate copy of the Ivey Affidavit is attached hereto as **Exhibit K**.)

113.     Plaintiffs have never defined the term "NERO game system." There is no known definition of the term.

### NERO ALLIANCE

114.     On August 30, 2001, Ventrella filed articles of incorporation for a domestic nonprofit corporation named "New England Role Playing Organization, Inc.," for the purpose of hosting larping events.

115.     Prior to forming the New England Role Playing Organization, Inc., Ventrella had been hosting and running larp games under the mark NERO.

116.     This entity marketed itself as NERO ALLIANCE.

117.     NERO ALLIANCE had their own version of the NERO Rule Book. (Ventrella Aff., ¶22 and Exhibit E thereto)

118.     New England Role Playing Organization, Inc., entity still exists.

119.     Plaintiffs have not undertaken any action against this use.


### NERO WORLD L.L.C. IS CREATED

120.     On April 23, 2015, NERO World L.L.C., (NERO World) SosId: 1441456  was formed in North Carolina by Ford Ivey.

121.     NERO World offers larping events.

122.     Plaintiffs did not undertake any action to prevent NERO World from offering events until Plaintiffs sought to add NERO World as a defendant in this action on April 12, 2022.

**COUNT I**

**CLAIM FOR DECLARATORY RELIEF
(DECLARATION OF NO TRADEMARK INFRINGEMENT
OR FALSE DESIGNATION UNDER SECTIN 43 (A) OF THE LANHAM ACT)**

123.     Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1-122 above, as though fully set forth herein.

124.     Plaintiffs have neither demonstrated any ownership or a clear chain of title to either the mark RAVEHHOLT or NERO mark.

125.     Any trademark rights that NIHC I or NIHC II possessed terminated with their respective dissolutions.

126.     The resurrection of NIHC I did not cause any intellectual rights it may have had to be revived as well.

127.     Since the Defendants had been using the marks for a long period prior to the resurrection of NIHC I, Defendants have priority over any rights that claimed by the revived NERO I.

128.     There is nothing of record to show that Valenti at any time offered any goods or services in his private capacity. He therefore could not have owned any trademark rights.

129.     On information and belief, there are no assignments of rights between NIHC I and Valenti or Valenti and either NIHC I or NIHC II.

130.     Further, Plaintiffs cannot assert rights in the mark NERO, or variations thereof as the NIHC I corporation was dissolved in 2002. Any trademark rights that the company may have had were abandoned.

131.    Plaintiffs' baseless assertion of trademark rights against Defendants interferes and infringes on Defendants lawful use of its marks.

132.    To the extent that company NERO Live Adventure Games LLC or NERO Live Adventures Games LLC existed, Plaintiffs cannot demonstrate that either of those organizations existed or owned any trademarks.

133.    If NERO Live Adventure Games LLC or NERO Live Adventures Games LLC existed, Plaintiffs cannot demonstrate chain of title between those entities and Plaintiffs.

134.    As Defendants are the rightful owners of the trademarks at issue there is no false designation of origin under Section 43 (a) of the Lanham Act.

135.    Defendants has no adequate remedy at law.

136.    Accordingly, Defendants seeks the entry of a judgment that Defendant's goods and services at issue do not infringe any rights allegedly owned by Plaintiffs pursuant to 28 U.S.C. 2201.

## COUNT II

### CLAIM FOR DECLARATORY RELIEF
### (DECLARATION OF NO DILUTION OF TRADEMARKS

137.     Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1-136 above, as though fully set forth herein.

138.    As Plaintiffs trademarks, to the extent any actually existed, terminated at the time the trademarks were abandoned, they cannot have achieved the status of a famous marks.

139.    Pursuant to  § 43(c) of the  Lanham Act, 15 U.S.C.A. § 1125(c), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.

140.    In order to assert the rights of a famous mark, Plaintiffs must own a trademark. As set forth above, Plaintiffs do not own any trademarks and therefore, they cannot make a valid claim of dilution.

141.    Assuming *arguendo*, that Plaintiffs did own a valid trademark, in order to prove that a mark has the achieved the status of a famous mark, a party claiming the status must show, a.) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; b.) the amount, volume, and geographic extent of sales of goods or services offered under the mark;  c.) the extent of actual recognition of the mark; and d.) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

142.    Plaintiffs have not demonstrated any of the elements required to establish that any marks that they may actually own have become famous.

143.    It is not possible that the mark NERO as shown in registration 2,270,409 has become famous at that registration was abandoned over 11 years ago. Plaintiffs have no other registrations under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

144.    Plaintiffs' baseless assertion of a famous trademark status against Defendants interferes and infringes on Defendants lawful use of its marks.

145.    Defendants has no adequate remedy at law.

146.    Accordingly, Defendants seeks the entry of a judgment that Plaintiffs marks are not famous pursuant to 28 U.S.C. 2201.

## COUNT III

## DECLARATORY JUDGMENT – COPYRIGHTS INVALID

147.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 – 146 above, as though fully set forth herein.

148.    Plaintiffs allege at various points in its Amended Complaint that Plaintiffs owned Copyrights in various works (see for example: ¶ 36 of Plaintiffs Amended Complaint).

149.    In support of its claims of copyright, Plaintiff produced four documents purporting to show registrations of copyright (Plaintiffs' Amended Complaint Exhibit J).

150.    Registration TX0008395398 – The NERO Barbarian Race Package -  shows a date of creation of 2005. The original author of this work was allegedly Noah Mason.

151.    Allegedly, Joseph Valenti acquired the copyright at some point.

152.    Registration record TX 0008390583 – Dwarven Race Package – shows a date of creation of 1998. Plaintiff Valenti claims authorship of this work.

153.    Registration record TX0008508892 – Gypsy – shows a date of creation  of 1995. The original author of this work was allegedly Selina Harvey.

154.    Registration record TX0008511203 – Hobling Race Packet – shows a date of creation of 1994. The original author of this work was allegedly Charles Firth.

155.    Valenti also seeks to assert rights in the NERO Rule Book 9th Edition; Copyright registration TX0008187083This work is a derivative work of previous editions of the book, none of which were ever owned or created by Plaintiffs. (Ventrella Aff., ¶ 35; Golosovker Aff., ¶22)

156.    The five registrations are referred to collectively as the "Works."

157.    All editions of the NERO Rule Book were based on contributions from a number of authors.

158.    All of the Works were/are derivative works of the works created by Ventrella, including, but not limited to the works registered by Ventrella, namely,  TX0003738607, TX0006107620, and TX0005217035.

159.    All of the works were created as collective works by various game players over the course of several years. No one individual created the Works.

160.    Pursuant to §201 (c) of the Copyright Act, "Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series."

161.    Consistent with that provision, each alleged author of the Works only owned a portion of the collective works.

162.    Valenti knew that the Works were collective works and he knowingly failed to disclose this information to the Copyright Office.

163.    Nonetheless, Plaintiffs seek to enforce rights in works to which they do not own any interest.

164.    In the event that NIHC I or NIHC II did in fact own any works subject to copyright,  any copyrights owned by NIHC I and NIHC II became "orphan copyrights" when these entities were dissolved.

165.    There was never assignment of any rights from NIHC I to Valenti prior to the dissolution of NIHC I.

166.    Valenti cannot claim ownership in copyrights that have been orphaned.

167.    No assignment of copyrights between Valenti and NIHC II existed.

168.    No assignment of copyrights could possibly have existed between NIHC I and NIHC II as NIHC I was dissolved in 2002 and NIHC II was created in 2005.

169.    NIHC I could not have obtained an assignment of copyrights from NIHC II as NIHC II was dissolved in 2011 and NERO I reinstated in 2017.

170.    There is nothing of record that establishes that NIHC I or NIHC II obtained any copyrights, either by creation or by assignment at any time.

171.    Although NIHC I was apparently revived under New York law, the revival of the company does not result in an "un-abandonment" of any intellectual property rights it may have had.

172.    Had the Copyright Office known of the facts regarding the creation of the Works, the Copyright Office would not have issued the registrations to Valenti.

173.    Defendants continue to be harmed by Plaintiffs' assertions of ownership of copyrights to which they do not own the rights against them.

174.    Defendants has no adequate remedy at law.

175.    Accordingly, Defendants seeks the entry of a judgment that Valenti's copyright registrations be declared invalid.

**COUNT IV**

**CLAIM FOR DECLARATORY RELIEF**
**<u>NO UNLAWFUL DOMAIN NAME REGISTRATION</u>**

176.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 – 175 above, as though fully set forth herein.

177.    Defendants' rights in its marks and domains pre-date any rights owned by Plaintiffs.

178.    Plaintiffs cannot show any valid use of any marks or names at any time.

179.    Defendants have been significantly harmed by Plaintiffs' misrepresentations and fraud.

180.    Defendants will continue to be harmed by Plaintiffs false assertions of ownership.

181.    Defendants has no adequate remedy at law.

182.    Accordingly, Defendants seeks the entry of a judgment that Defendants' domain names do not constitute an unlawful domain name registration.

## COUNT V

## FRAUDULENT MISREPRESENTATION/ FRAUD IN THE INDUCEMENT

183.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 – 182 above, as though fully set forth herein.

184.    Plaintiffs knowingly and fraudulently represented to Defendants at the time that Defendants acquired NEROtix in 2008, that Plaintiffs were the rightful owners of intellectual property, including copyrights in the Rule Book and trademarks.

185.    Plaintiffs never owned any rights to the Rule Books.

186.    Regarding the trademarks, Valenti maintained a charade of ownership in the federal registration for the NERO mark (registration 2,270,409), by forming NIHC II, which used the same name as NIHC I, and then representing to the Patent and Trademark Office that NIHC II was in fact NIHC I.

187.    By virtue of this ruse on the Patent and Trademark Office, Valenti was able to maintain the registration of the NERO mark.

188.    This act of misrepresentation is clear evidence of fraud on the Patent and Trademark Office.

189.    Although Plaintiffs has lost their trademark registration by abandonment when NIHC I ceased operations, Plaintiffs continually represented to the Defendants that Plaintiffs held valid trademark rights.

190.    Defendants relied on the representations made by the Plaintiffs and were induced into entering into an agreement with Plaintiffs.

191.    Had the Defendants known the true facts surrounding Plaintiffs alleged rights they would not have entered into an agreement with Plaintiffs.

192.    Over the course of several years, Defendants paid Plaintiffs thousands of dollars in license fees.

193.    Defendants have been significantly harmed by Plaintiffs' misrepresentations and fraud in that they were required to pay fees to Plaintiffs.

194.    Defendants have no adequate remedy at law.

195.    Accordingly, Defendants seek entry of a judgment that Plaintiffs fraudulently induced Defendants into entering into an agreement and, because of the fraudulent inducement any and all agreements between the parties are null and void *ab initio*.

## COUNT VI

## TRADEMARK INFRINGEMENT ON RAVENHOLT REGISTRATION

196.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 - 195 above, as though fully set forth herein.

197.     Defendant Tyler registered the mark RAVENHOLT with the Patent and Trademark Office on June 7, 2016, (registration number 4,973,167) in connection with entertainment services in international class 41 (hereinafter referred to as "Defendants Mark").

198.     Defendants have been continuously using Defendants' Mark in connection with the sale and advertising of the entertainment services in interstate commerce in the United States since at least as early as the dates identified in the registration.

199.     Plaintiffs have now asserted that they are using the identical mark to advertise identical services to the same consumers using the same channels of trade and marketing.

200.     Plaintiffs use of the same mark in connection with identical services is likely to cause confusion, mistake or deception as to the source of origin of Plaintiffs' services in that the public, the trade and others are likely to believe that Plaintiffs' services are: (a) the same services as Defendants; or (b) provided by, sponsored by, approved by, licensed by, affiliated with or in some other way legitimately connected to Defendants and/or its goods, services or licensed products.

201.     Priority is not an issue as Defendants adopted, used, and registered the Defendants Mark well before any use of the mark by Plaintiffs, especially as both NIHC I and NIHC II were dissolved prior to the adoption and use of the mark by Defendants.

202.      NIHC I was not reinstated until 2017, therefore it could not have possibly used the mark prior to Defendants' date of first use.

203.     Valenti never used the RAVENHOLT mark to offer services.

204.     Plaintiffs knew of Defendants use prior to adopting the mark for their own use.

205.     By reason of the forgoing, Defendants have suffered and will continue to suffer monetary damages in an amount not yet determined.

206.    Accordingly, Defendants seek entry of a judgment that Plaintiffs are infringing Defendants marks and are liable for all damages caused by their infringement.

## COUNT VII

## COMMON LAW TRADEMARK INFRINGEMENT

207.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 – 206 above, as though fully set forth herein.

208.    Defendants own and enjoy common law trademark rights in the marks NEROtix and NERO.

209.    Defendants' common law rights were established long before any marks claimed by Plaintiffs.

210.    In view of the association by the public of the Defendants' common law rights and their services, Plaintiffs' use of identical marks for identical services is causing and is likely to cause confusion, mistake, and deception of the relevant public as to whether Plaintiffs' products and services emanate from, or are sponsored or approved by, Defendants.

211.    The conduct of Plaintiffs complained of herein constitutes common law trademark and trade dress infringement, all of which has damaged and will continue to damage irreparably Defendants' valuable goodwill unless enjoined by this Court

212.    As result of Plaintiffs' conduct, Defendants have suffered and will continue to suffer monetary damages in an amount not yet determined.

213.    Accordingly, Defendants seek entry of a judgment that Plaintiffs are infringing Defendants marks and are liable for all damages caused by their infringement and imposing an injunction against Plaintiffs further use of the marks.

## COUNT VIII

## __TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP__

214.    Defendants incorporate herein by reference each and every allegation contained in Paragraphs 1 – 213 above, as though fully set forth herein.

215.    Plaintiffs have asserted that a valid agreement existed between Maureen Ivey and Ford Ivey and Rachel Morris.

216.    Valenti knew of the existence of this agreement.

217.    Valenti then misrepresented to Morris that she must terminate this agreement with the Ivey's and enter into an agreement with him.

218.    Relying on the representations of Valenti, Morris indeed terminated the agreement with the Ivey's and entered into an agreement with NIHC I.

219.    When Tyler acquired the business from Morris, she stepped into the shoes of Morris.

220.    Tyler assumed the rights that Morris had and therefore has the right to assert the cause of action against Plaintiffs.

221.    Defendants have been harmed by Plaintiffs' representation that they must terminate the agreements with the Iveys and enter into an agreement with Plaintiffs.

222.    Defendants were not repaid the consideration paid to the Iveys.

223.    As result of Plaintiffs' conduct, Defendants have suffered and will continue to suffer monetary damages in an amount not yet determined.

224.    Accordingly, Defendants seek entry of a judgment that Plaintiffs are liable for the amounts paid to Plaintiffs caused by Plaintiffs' interference.

**COUNT IX**

**COMMON LAW UNFAIR COMPETITION**

225.     Defendants incorporate herein by reference each and every allegation contained in

Paragraphs 1 – 224 above, as though fully set forth herein.

226.     Plaintiffs aforementioned acts are likely to cause confusion, misrepresentation

and/or to cause mistake or to deceive the public as to the affiliation, approval, sponsorship or

connection between Plaintiffs and Defendants and constitutes unfair competition under the

common law.

227.     As result of Plaintiffs' conduct, Defendants have suffered and will continue to

suffer monetary damages in an amount not yet determined.

**COUNT X**

**VIOLATION OF M.G.L. c. Mass 93A**

228.     Defendants incorporate herein by reference each and every allegation contained in

Paragraphs 1 – 227 above, as though fully set forth herein.

229.     Plaintiffs have plead that they are conducting trade or commerce within the

meaning of M.G.L. Chapter 93A.

230.     The many above identified, repeated egregious acts of intentional fraud and

misrepresentation by Plaintiffs over an extended period of time constitute unfair, deceptive, and

fraudulent acts pursuant to M.G.L. chapter 93A.

231.     Defendants have been and will continued to be damaged by Plaintiffs egregious

acts of fraud, coercion, as well as Plaintiffs' unfair and deceptive trade practices. In particular,

Defendants have been harmed by Plaintiffs continued assertions that they are owners of non-

existent trademark rights and copyrights in an attempt to extort money from Defendants.

232.    Plaintiffs many acts of willful, intentional, malicious acts are the direct and proximate cause of substantial harm to Defendants that justify a trebling of damages, costs, and attorneys against Plaintiffs.

**WHEREFORE**, Defendants respectfully requests that the Court:

1. Dismiss all of Plaintiffs' claims with prejudice;

2. Declare that the RAVENHOLT registration number 4,973,167 is valid and protectable;

3. Declare that Plaintiffs' have infringed Defendants' RAVENHOLT mark;

4. Declare that Defendants domain name registrations are not unlawful;

5. Granting a preliminary and permanent injunction restraining Plaintiffs, its officers, directors, principals, agents, servants, employees, successors and assigns, and all individuals acting in concert or participation with, from:

    a. Using any mark that is similar to RAVENHOLT or NEROtix, including, but not limited to the mark NERO;

    b. making, using, offering for sale, selling, or distributing any goods or services that are related to those offered by Defendants;

    c. unfairly competing with Defendants in any manner.

6. Directing Plaintiffs to use their best efforts to recall from third parties any and all infringing goods and to cease any marketing, advertising and promotional materials using the RAVENHOLT, NERO  or NEROtix marks;

7. Directing Plaintiffs  to file with the Court and serve on counsel for Defendants, within thirty days after entry of any injunction issued by the Court in this action, a sworn

statement as provided in 15 U.S.C. § 1116 setting forth in detail the manner and form in which Plaintiffs have complied with the injunction;

8. Directing Plaintiffs to deliver up to Defendants' counsel for destruction or other disposition, within thirty days of the entry of final judgment herein, any and all infringing goods and any promotional, marketing, advertising, and promotional materials used in connection with the sale or marketing of any goods or services, now or hereafter in its possession, custody, or control, which contain the terms RAVENHOLT or NERO;

9. Pay to Defendants their actual damages and profits for the infringement of Defendants' intellectual property, including, but not limited to Defendants' trademarks by Plaintiffs;

10. Repay to Defendants all licensing fees paid to Plaintiffs by Defendants under the license agreement(s) that Defendants entered into upon the fraudulent representations by Plaintiffs;

11. Declare that Plaintiffs do not hold any valid copyrights in the copyrights claimed by Plaintiff and declare that if the Copyright Office had been aware of the true circumstances surrounding Valenti's application for registration of the copyrights, the Copyright Office would have refused registration of the works;

12. Award Defendants reasonable fees, including attorney's and costs in this action;

13. Award Defendants punitive damages and, for Plaintiffs repeated fraudulent intentional acts committed on Defendants;

14. Trebling the amount of such award on account of Plaintiffs' willful, intentional, and bad faith conduct pursuant to 15 U.S.C. § 1117 and Mass. Gen. Law c. 93A;

15. Require Plaintiffs to provide tax returns, receipts and other documents evidencing all amounts received by Plaintiffs while marketing their services under the RAVENOLT and NERO marks.

16. Direct the Copyright Office to void the registrations issued to Valenti; and

17. grant such other and further relief as it deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Counterclaimants hereby demands a trial by jury.

Respectfully submitted,

NEROTIX UNLIMITED INC. AND ANNEMARIE TYLER

DEFENDANTS/COUNTER-CLAIMANTS

By: <u>/s/ William E. O'Brien</u>

William E. O'Brien, Esq.

BBO #552553

O'Brien Global Law
2 Connector Road, Suite 200
Westborough, MA 01581
(781) 956 - 5363
william@masstechlawyer.com

<u>Certificate of Service</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for Defendants by filing the document using the Court's PACER system, resulting in transmission of the Notice of Electronic Filing upon registered PACER users through the Court's transmission facilities on June 21, 2022.

EXHIBITS OVERVIEW:

EXHIBIT A - AFFIDAVIT OF MICHAEL VE NTRELLA

EXHIBIT B - COPYRIGHT REGISTRATION TX0003738607

EXHIBIT C - COPYRIGHT REGISTRATION TX0005217035

EXHIBIT D - COPYRIGHT REGISTRATION TX0006107620

EXHIBIT E - AFFIDAVIT OF MICHAEL GOLOSOVKER

EXHIBIT F - ASSIGNMENT DOCUMENT

EXHIBIT G - SCREENSHOT FROM NEW YORK STATE CORPORATIONS' DIVISION
             REGARDING NIHC I

EXHIBIT H - SCREENSHOT FROM NEW YORK STATE CORPORATIONS' DIVISION
             REGARDING NIHC II

EXHIBIT I - NERO 9th EDITION – LIVE ADVENTURES GAMES LLC EDITION

EXHIBIT J - PATENT AND TRADEMARK OFFICE FILE HISTORY FOR THE NERO
             MARK

EXHIBIT K - AFFIDAVIT OF FORD IVEY