**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
NERO INTERNATIONAL HOLDING CO., INC.    )
and JOSEPH VALENTI,                     )
                                        )
    Plaintiffs/Counterclaim Defendants, )
                                        )
NEROTIX UNLIMITED INC.,                 )          Civil Action
ANNEMARIE TYLER,                        )          No. 21-cv-11302-PBS
WILLIAM J. BEARDEN,                     )
NERO WORLD, LLC,                        )
                                        )
    Defendants/Counterclaim Plaintiffs. )
_____  )


**MEMORANDUM AND ORDER**

September 27, 2023

Saris, D.J.


**INTRODUCTION**

Live action role playing, or "LARPing," is an interactive game in which participants engage in storytelling and physically act as characters with costumes and props. The participants play according to rules and goals set by the games' organizers. The New England Roleplaying Organization ("NERO") refers to a specific LARP system in which participants live in a fantasy medieval town and act out a live action fantasy adventure.

This action is a heavily litigated trademark and copyright case which raises multiple difficult issues (some poorly briefed) concerning intellectual property rights associated with NERO.

1

Plaintiffs Joseph Valenti and NERO International Holding Co., Inc. filed suit against Defendants William J. Bearden, NERO World, LLC, Annemarie Tyler, and NEROtix Unlimited Inc., alleging violations of federal and state trademark law and copyright law. The principal issue in dispute is determining the rightful ownership of three trademarks (NERO, NERO NEW ENGLAND ROLEPLAYING ORGANIZATION, and RAVENHOLT) and one copyright (9th Edition NERO Rule Book).

Plaintiffs and Defendants have cross-moved for summary judgment on most of the claims and counterclaims in this action. See Dkts. 80, 86, 87, 88. For the following reasons, after hearing, the Court **ALLOWS** the motions in part and **DENIES** them in part.

## BACKGROUND

The following facts are taken from Plaintiffs' Statement of Material Facts (Dkt. 81) and the Defendants' Statements of Material Facts (Dkt. 86-1 at 4-8; Dkt. 87-1 at 4-9; Dkt. 88-1 at 4-8). These facts are undisputed unless otherwise noted.

## I.   **Origin of NERO**

NERO is one system of a LARP game that was started in 1988 by several members, one of whom was Ford Ivey. The founding members ran LARPing events in Massachusetts throughout the 1990's. The Massachusetts NERO chapter became known as "Ravenholt," which is the name of a fictitious town or "duchy" in the NERO game.

After a few years, the group began signing up NERO chapters in different locations across the United States. These initial NERO chapters were based on verbal agreements, rather than on written license agreements. A National Plot Committee was developed to help coordinate plotlines so that players could travel with their "characters" and attend events at different NERO chapters. By 1997, Ford Ivey and his then-wife Maureen Ivey had established a company called NERO International, Inc., which ran NERO events for the Massachusetts chapter and made licensing agreements with NERO chapters in other parts of the country.

## II.  **Valenti Gets Involved**

In 1990, Plaintiff Joseph Valenti attended his first NERO event at the Massachusetts chapter and became friends with Ford Ivey. In the following years, Valenti attended several NERO events. In 1997, Valenti entered into a license agreement with NERO International, Inc. and spent approximately ten years running ten to twelve NERO events every year.

One dispute in this action is whether Valenti purchased or licensed the intellectual property associated with the Iveys' company. In 1998, Ford Ivey sought to sell NERO International, Inc. as part of a divorce settlement with his wife. On July 24, 1998, Valenti formed NERO International Holding Co., Inc. ("NIHC") for the purpose of purchasing the Iveys' company. Valenti testified that the Iveys and Valenti executed a formal purchase agreement

selling NERO International, Inc. to NIHC, including all intellectual property associated with the company, on August 3, 1998. As part of the agreement, according to Valenti, NIHC granted back to the Iveys a non-royalty license so they could continue operating Ravenholt, the Massachusetts NERO chapter. However, Valenti claims the formal purchase agreement was later destroyed. Plaintiffs have produced a draft agreement with proposed terms that they contend reflects the final agreement. See Dkt. 83-3.

In contrast, Defendants contend that Valenti never purchased the Iveys' business -- instead, they claim that Valenti simply licensed the right to use the NERO mark from the Iveys, as supported by testimony from one of the founders of NERO, David Jodoin. Jodoin testified that he remembered "seeing a draft of an agreement" between the Iveys and Valenti, and that the draft referred to a license, not a sale of assets. Dkt. 92-1 at 23.

### III.   **The NERO Trademark**

In 1998, Ford Ivey applied to register the NERO trademark with the United States Patent and Trademark Office ("USPTO"). The application matured to registration on August 17, 1999 as Reg. No. 2,270,409. In 2005, an attorney prepared and filed a nunc pro tunc assignment commemorating the fact that Valenti, as President of NIHC, had acquired from Ford Ivey all rights to the NERO trademark registration back in 1998. See Dkt. 83-8. The assignment states:

> Joseph Valenti, President of Nero International Holding Co., Inc. . . . . acquired all rights from the "Assignor" identified below, to the Nero® trademark, on August 3, 1998 by Bill of Sale . . . . [T]his document commemorates that, said Assignor assigned to Assignee, all rights, title, and interest in the NERO® trademark and the good will of the business symbolized thereby.

Id. at 2. The assignment was signed by Ford Ivey in 2005 but backdated to August 3, 1998.

In March 2010, the NERO trademark registration was cancelled by the USTPO due to a failure to file renewal paperwork.

## IV.  **Valenti's Companies**

Valenti's company NIHC was first incorporated in 1998 in New York. See Dkt. 83-2. Around this time, Valenti also launched a website at the domain name "nerolarp.com." In June 2002, the New York Department of State dissolved NIHC due to a failure to pay taxes. In February 2005, an attorney filed and created a second New York corporation using an identical name (i.e., "NERO International Holding Co., Inc.").[1] Valenti was not aware a second corporation had been created, as he believed the attorney had simply revived NIHC I. In April 2011, NIHC II was also dissolved due to a failure to pay taxes.

In 2011, Valenti formed another company called NERO Live Adventure Games, LLC ("NLAG") in Pennsylvania to continue his NERO

---

[1] The Court uses "NIHC I" to refer to the first corporation formed in 1998 and dissolved in 2002, and "NIHC II" to refer to the second corporation formed in 2005 and dissolved in 2011.

business. However, because Valenti did not complete and file the paperwork correctly, NLAG was not correctly formed. In 2017, Valenti annulled the dissolution of NIHC I and reinstated the company as an active New York corporation.

V.   **License Agreements**

Starting in the early 2000's, Valenti's various corporate entities executed license agreements with chapters across the country. Chapter licensees were granted the rights to use the marks NERO and NEW ENGLAND ROLEPLAYING ORGANIZATION (collectively, "NERO Marks"), NERO game content, and the NERO Rule Book, in exchange for royalty fees. For example, the chapter license agreements typically included the following provision:

> Under the License Agreement, Licenser grants to Licensee the right to operate a facility under the service mark NERO, New England Role-playing Organization, and NERO GAME SYSTEM.

Dkt. 83-17 at 3. The license agreements also stated that "Licenser requires the NERO Rule Book ©, and NERO Coins ©, to be purchased exclusively from Licenser or Licenser[']s designated supplier." Id. The average life of a NERO license was approximately five to ten years.

In August 2000, NIHC I executed a license agreement with Rachel Morris so that she could run the Massachusetts NERO chapter. See id. After the dissolution of NIHC I in 2002, Valenti continued to grant licenses to various chapters with NIHC still listed as

the licensor, even though the company had been dissolved. See Dkts. 83-18, 83-19, 83-20, 83-21. These license agreements were titled "NERO ® License Offering ©." After the formation of NIHC II in 2005, license agreements with NIHC listed as the licensor continued to be granted to chapters. See Dkts. 83-22, 83-23, 83-24. By 2006, there were about 35 active NERO chapters across the United States. This increased to about 50 active chapters by 2010.

After NIHC II was dissolved in 2011, Valenti began granting licenses to chapters with "NERO Live Adventures Games, LLC" listed as the licensor instead. See Dkts. 83-33, 83-34. After NIHC I was reinstated as an active New York corporation in 2017, Valenti continued to execute license agreements with chapters, although this time with the licensor listed as "Joseph Valenti, operating directly and DBA NERO International Holding Co., Inc." See Dkt. 83-39; see also Dkt. 83-40.

In 2014, Valenti was asked at a deposition if the NERO corporation was still in existence, to which he replied: "Actually it may be in existence. I retired that business in 2009 when I lost everything, and I transferred everything to me." Dkt. 86-2 at 202. Valenti also testified that "a lot of [the] paperwork" associated with the transfer of assets and licenses to himself "got destroyed" because they were not "waterproof or tree-proof." Id.

## VI.  **Bearden and NERO World**

William J. Bearden is a fan of LARPing and has been involved with the games since the early 1990's. In April 2006, NIHC licensed to Bearden the rights to run a NERO chapter in Kansas called "NERO Central." See Dkt. 83-24. Bearden registered the website domain name "nerocentral.com" and launched the website to advertise NERO events. Today, the domain name redirects to Bearden's other website named "heroicadventure.co." Bearden renewed the domain name "nerocentral.com" in April 2022.

In April 2009, Bearden believed Valenti's practices were becoming intolerable. He participated in a symposium of dissenting NERO chapter owners and joined a different LARPing organization called Heroic Interactive Theatre, Inc. In April 2012, Valenti terminated Bearden's NERO license. Valenti filed suit against Bearden in 2013 in Kansas state court for breach of contract, tortious interference, and conspiracy to take Valenti's intellectual property. See Dkt. 86-3 at 111. The suit was eventually dismissed due to ineffective service.

On January 31, 2014, Bearden filed an application to register the mark "NERO NEW ENGLAND ROLEPLAYING ORGANIZATION." Bearden indicated a first use date of June 14, 2006. Bearden claims that he filed the application because he "believed that Mr. Valenti was no longer operating a business known as [NIHC]" and he "perceived that Mr. Valenti was no longer using the mark." Dkt. 92-4 at 55.

The application matured to registration on the USPTO's Supplemental Register on March 3, 2015 as Supp. Reg No. 4,697,406, covering the following services: "[e]ntertainment, namely, production of live-action role playing games and interactive theatre productions." Dkt. 84-9 at 4.

On May 13, 2014, Bearden filed another application, this time to register the mark "NERO." The mark registered on the USPTO's Supplemental Register on December 16, 2014 as Supp. Reg. No. 4,657,988. See Dkt. 84-10. In September 2015, Bearden assigned this registered trademark to NERO World, LLC ("NERO World"). See Dkt. 84-11. NERO World is a company founded by Ford Ivey in 2015, that Bearden later acquired in November 2021.

In 2017, Valenti filed cancellation proceedings against Bearden's and NERO World's NERO trademark registrations on the Supplemental Register, but the proceedings were suspended with the commencement of this action.

## VII. **Tyler and NEROtix**

In July 2000, the Iveys sold the Massachusetts NERO chapter, Ravenholt, to Rachel Morris. See Dkt. 83-14. As part of the purchase agreement, the Iveys terminated their license with NIHC. See Dkt. 83-15. In August 2000, Morris entered into a license agreement with NIHC, which permitted Morris to use the NERO Marks for her chapter. See Dkt. 83-17. Morris incorporated her business

as NEROtix Unlimited Inc. ("NEROtix") and operated the chapter for about eight years.

In January 2009, Morris and Tyler executed a NEROtix Stock Purchase Agreement which transferred all shares in NEROtix, in addition to the domain name "neromass.com," to Tyler. See Dkt. 83-30. For a few years, Tyler continued to run the Ravenholt chapter under the same license granted to NEROtix by NIHC back in 2000. But by 2015 or 2016, Tyler stopped paying royalty payments to Valenti, resulting in the termination of NEROtix's license on July 21, 2016.

On October 21, 2015, Tyler filed an application to register RAVENHOLT as a trademark. The application matured to registration on the Principal Register as Reg. No. 4,973,167. See Dkt. 84-12. In December 2021, Tyler filed a declaration of use in connection with the RAVENHOLT registration, in which she attested that the mark was in use. Due to the COVID pandemic, NEROtix could not run any events in 2020 and 2021, but the company continued to write stories, design props and costumes, and conduct online roleplaying.

In 2017, Valenti filed cancellation proceedings against Tyler's RAVENHOLT registration on the Principal Register, but the proceedings were suspended with the commencement of this action.

## VIII. <u>NERO Rule Book</u>

In 1990, the first edition of the "New England Roleplaying Organization Player's Handbook," or NERO Rule Book, was created and published with a copyright notice that stated: "This book is © 1990 by NERO and Gamemaster and is for use in the official NERO games only." Dkt. 51-2 at 3. The next five editions of the NERO Rule Book included similar copyright notices stating that the copyright owners were some combination of NERO, Gamemaster, Legends Unlimited, Inc., NERO International, Inc., and/or New England Roleplaying Organization. For example, the 6th Edition listed New England Roleplaying Organization and Legends Unlimited, Inc. as the copyright owners.

In 1995, Ford Ivey registered the copyright of the 6th Edition NERO Rule Book, listing himself as the copyright claimant and Lawrence J. Digiusto as the illustrator. <u>See</u> Dkt. 83-41 (Registration Number TX0004003776). In 1997, the 7th Edition was published and displayed the following notice: "This book is © 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997 by NERO International, Inc. The NERO name and logo is a registered trademark of NERO International, Inc." Dkt. 92-4 at 74.

Around 1999, Valenti began revising the 7th Edition, and in 2001, he released an updated version as the 8th Edition, which had minimal changes from the prior 6th and 7th Editions.

In 2008, Valenti decided that it was time to incorporate additional materials into the NERO Rule Book and issue a 9th Edition. Michael Golosovker, a NERO member of several years, offered to help with revisions, which Valenti accepted. The 9th Edition was published in January 2011 and contained a notice that stated: "The NERO Rule Book is © 1990, 1991, 1992, 1993, 1994, 1997, 1999, 2011, 2014 by Joseph Valenti" and "The NERO name and logo is a ~~registered~~ trademark of NERO International Holding co., Inc." See Dkt. 83-43 at 2 (strike in the original). On September 21, 2015, Valenti registered the copyright in the 9th Edition NERO Rule Book under his own name. See Dkt. 83-42 (Registration Number TX0008187083). Several years later in October 2022, after this suit had commenced, Golosovker assigned his purported rights in the 9th Edition to NERO World. See Dkt. 86-2 at 205.

In 2017, Valenti learned that Ivey may not have obtained copyright assignments from all the individuals who contributed to the NERO Rule Books and game content. Thus, he began contacting numerous contributors to the NERO Rule Book, including several of the original NERO founders. Between 2017 to 2018, Valenti obtained over 100 copyright assignments from individuals who created content for the NERO Rule Books over the years. See, e.g., Dkt. 83-45.

Around 2018, Ford Ivey enlisted Jason Mote, a former NERO chapter licensee, to help "update the rules" so that Ivey's new

company, NERO World, could release its own rule book. Dkt. 84-3 at 10. Mote testified that he used the 9th Edition NERO Rule Book as a "reference" and rewrote it using his own words while avoiding significant changes; his task "was to reimagine the existing rules in [his] own words but keep the feel of the book the same." Id. In June 2019, NERO World released Mote's revised version of the rule book, which it titled "NERO World Classic Rulebook, 1st Edition." See Dkt. 83-46.

For at least a period of time, the 9th Edition NERO Rule Book could be downloaded from the "neromass.com" website owned by Tyler and the "nero.world" website owned by Bearden.

## IX.   **Procedural History**

Plaintiffs initially filed this action against Tyler and NEROtix in August 2021. In February 2022, the Court allowed Bearden's motion to intervene as defendant and counterclaim plaintiff based on his purported ownership of the mark NERO NEW ENGLAND ROLE PLAYING ORGANIZATION. See NERO Int'l Holding Co. v. NEROtix Unlimited Inc., 585 F. Supp. 3d 152, 154 (D. Mass. 2022). NERO World was joined shortly thereafter. Plaintiffs then filed a First Amended Complaint ("FAC") in June 2022. See Dkt. 46. In an attempt to narrow the issues in this action, the parties stipulated to dismissal of Plaintiffs' trademark dilution, breach of

contract, and Chapter 93A claims, in addition to Defendants' Chapter 93A claims.[2] See Dkts. 75, 79.

Currently before this Court are four cross-motions for summary judgment. Plaintiffs move for summary judgment on twelve of Plaintiffs' counts and two of Defendants' counterclaims (Dkt. 80).[3] Defendant Bearden moves for summary judgment on five of Plaintiffs' counts (Dkt. 86).[4] Defendant NERO World moves for summary judgment on all of Plaintiffs' remaining counts against it (Dkt. 87).[5] Defendants Tyler and NEROtix jointly move for summary judgment on all of Plaintiffs' remaining counts against them (Dkt. 88).[6]

## **LEGAL STANDARD**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material

---

[2] Counts III, VIII, IX of the FAC (Dkt. 46); Counts II, VIII, and X of Plaintiffs' Answer and Counterclaims (Dkt. 33); Count X of Tyler & NEROtix's Counterclaims (Dkt. 51); Count V of Bearden's Counterclaims (Dkt. 31).

[3] Counts I, II, IV, V, VI, and VII of the FAC (Dkt. 46); Counts I, III, IV, V, VI, and VII of Plaintiffs' Answer and Counterclaims (Dkt. 33); Count V of Tyler & NEROtix's Counterclaims (Dkt. 51); Count III of Bearden's Counterclaims (Dkt. 31); and affirmative defenses alleging that Plaintiffs abandoned trademarks at issue.

[4] Counts I, III, IV, V, and IX of Plaintiffs' Answer and Counterclaims (Dkt. 33); and corresponding affirmative defenses.

[5] Counts I, III, IV, V, VI, VII, and IX of Plaintiffs' Answer and Counterclaims (Dkt. 33); and corresponding affirmative defenses.

[6] Counts I, II, IV, V, VI, and VII of the FAC (Dkt. 46); and corresponding affirmative defenses.

fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists where the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court must view the record in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). When the parties cross-move for summary judgment, the court must evaluate each motion "separately, drawing inferences against each movant in turn." Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quoting EEOC v. S.S. Clerks Union, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

## DISCUSSION

### I.   The Trademark Dispute

#### A. Trademark Infringement

Plaintiffs contend that all four Defendants unlawfully use Plaintiffs' trademarks in violation of the Lanham Act. Specifically, Plaintiffs allege that Bearden's and NERO World's continued use of the NERO Marks in connection with LARPing activity is likely to cause confusion with Plaintiffs' use of the NERO Marks. Similarly, Plaintiffs allege that Tyler's and NEROtix's continued use of the NERO Marks and the RAVENHOLT mark is likely to cause confusion with Plaintiffs' use of the same.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "creates a cause of action for infringement of unregistered marks." Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc., 828 F. Supp. 2d 384, 390 (D. Mass. 2010). The statute makes liable:

> [a]ny person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a). To prevail on a § 1125(a) trademark infringement claim, the plaintiff must prove: "1) the ownership of a distinctive mark entitled to trademark protection, 2) the use of that name in interstate commerce, and 3) its use by another in a manner likely to cause confusion as to the origin of the source of the goods or services." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 63 F. Supp. 3d 149, 157 (D. Mass. 2014) (quoting Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc., 397 F. Supp. 2d 245, 257 (D. Mass. 2005)), partially rev'd on other grounds, 794 F.3d 168 (1st Cir. 2015). Here, the parties stipulate that the "crux of the dispute over Plaintiffs' trademark infringement claims in this action centers around the first element, namely, ownership of the trademarks at issue." Dkt. 82

16

at 3. Thus, resolution of the parties' cross-motions for summary judgment on Plaintiffs' trademark infringement claims hinges on whether genuine issues of fact exist as to Plaintiffs' ownership of the trademarks at issue.[7]

### 1. Legal Standard for Trademark Ownership

An individual may acquire ownership of a trademark in two ways. First, "a party may file for registration of a mark with the USPTO if it presently uses, or has a bona fide intention to use, the mark in commerce." Nexsan Techs., Inc. v. EMC Corp., 260 F. Supp. 3d 68, 75 (D. Mass. 2017) (citing 15 U.S.C. § 1051). The second method is by showing prior use, either by "(1) making first actual use of a mark in a genuine commercial transaction; or (2) having prior use analogous to trademark or service mark use." Id. (cleaned up) (quoting Herbko Int'l, Inc. v. Kappa Books, Inc., 308 F.3d 1156, 1162 (Fed. Cir. 2002)). For registered and unregistered marks, "in either circumstance, the right is conditioned upon use in commerce." Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir. 2004).

---

[7] In addition to 15 U.S.C. § 1125(a), Plaintiffs also allege trademark infringement under 15 U.S.C. § 1114 against Tyler and NEROtix. Section 1114 provides protection for federally registered marks. Plaintiffs' NERO mark was registered in August 1999 (Reg. No. 2,270,409), but this registration was later cancelled in March 2010. Regardless, the parties stipulate that resolution of the ownership and likelihood of confusion issues would resolve Plaintiffs' claims under both § 1125(a) and § 1114.

Abandonment of a mark occurs when "its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances." 15 U.S.C. § 1127. "Use" of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." Id. Three consecutive years of nonuse is prima facie evidence of abandonment. See Gen. Healthcare, 364 F.3d at 336 ("A trademark owner who fails to use a mark for three consecutive years may be deemed to have abandoned the mark, which would then fall into the public domain."). The burden then shifts to the purported trademark owner to demonstrate that it intended to resume use of the mark by providing evidence of activities engaged in during the nonuse period that manifest such intent. Id. at 337. Abandonment of a trademark must be "proved by clear and convincing evidence." Dialogo, LLC v. Bauza, 467 F. Supp. 2d 115, 128 (D. Mass. 2006) (quoting Micromuse, Inc. v. Micromuse, PLC, 304 F. Supp. 2d 202, 216 (D. Mass. 2004)).

A temporary dissolution or cessation of a company does not mean that the company's trademark has come to an end. See J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 17:14 (5th Ed. 2023). "Even if the mark is unused for some years, continuing efforts to maintain the ability to resume use and to sell the rights are evidence of an intent to resume use of the mark." Id. In particular, "[t]he temporary and

involuntary dissolution of a corporation for failure to file corporate reports while the corporation made a continuing use of a tradename or mark does not result in abandonment of the mark or a break in the chain of continuity of use." Id. (citing Stock Pot Rest. v. Stockpot, Inc., 737 F.2d 1576, 1580 (Fed. Cir. 1984)).

### 2. The NERO Marks

The linchpin of Plaintiffs' ownership claim over the NERO Marks is that Plaintiffs purchased the marks from the Iveys in 1998 and have not ceased use of them for the past 25 years. Defendants raise three arguments contesting Plaintiffs' ownership: (1) Plaintiffs did not purchase the Iveys' company in 1998; (2) Plaintiffs abandoned the marks due to dissolution of NIHC I and II and the lack of continued use of the marks thereafter; and (3) Valenti was not the sole shareholder of NIHC I and II. The Court addresses each of Defendants' arguments in turn.

### i.   Purchase of NERO Marks

First, Plaintiffs assert that on August 3, 1998, the Iveys and Valenti executed a formal purchase agreement whereby Valenti's company NIHC purchased the Iveys' company NERO International, Inc., including all the intellectual property associated with the company. Valenti testified that the formal purchase agreement was destroyed. However, Plaintiffs produced a proposal document they contend reflects the "proposed terms of the transaction which was

19

very close in substance and form to the final purchase documents."

Dkt. 81 at 10. The proposal states:

> Joseph Valenti, representing Nero International Holding Company, Incorporated, (termed "buyer" herein) will acquire 70% of the stock of the NERO International business, 50% from Maureen Ivey, 20% from Ford Ivey. The sale shall include all ownership and rights to the NERO Copyright, NERO Trademark, NERO Rule Book (all past and future editions), all associated intellectual materials such as NERO International in-game worlds, adventures, tales and mysteries, and all current contracts, licensing, and lease offerings with existing businesses and organizations.

Dkt. 83-3 at 3. The proposal also includes a provision licensing back to the Iveys the right "to operate ONE non competing NERO chapter in Massachusetts under the same terms and conditions as any other chapter without paying the start-up fee or monthly royalty fees." Id. at 6.

Plaintiffs also offer the 2005 nunc pro tunc assignment of the registered NERO trademark (Reg. No. 2,270,409) as evidence that Plaintiffs purchased the Iveys' company in its entirety. See Dkt. 83-8 at 2. Significantly, the nunc pro tunc assignment was signed by Ford Ivey in 2005 but backdated to "August 3, 1998" to commemorate the fact that on that date, the Iveys sold their registered NERO trademark to "Valenti, President of [NIHC]."[8] Id.

---

[8] The backdating of a trademark assignment is permissible for a nunc pro tunc assignment and does not constitute fraud. See Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc., 581 F. Supp. 3d 460, 471-72 (E.D.N.Y. 2021) (finding nunc pro tunc assignment executed prior to lawsuit was valid and conferred standing).

Defendants dispute that Valenti purchased the Iveys' company or the intellectual property rights associated with it. Instead, they contend that Valenti merely acquired a license. Defendants' only evidentiary support for their position is testimony from David Jodoin, one of the founders of NERO, who stated that he remembered "seeing a draft of an agreement" between the Iveys and Valenti, and that the draft referred to a license, not a sale of assets. Dkt. 92-1 at 23.

However, Jodoin also testified that Ford Ivey "originally licensed the franchise to [Joseph] Valenti," but later when Ivey "was going through a divorce and he needed to raise money for his divorce settlement . . . that's when he actually decided to sell it to [Valenti]." Dkt. 97-2 at 36. Moreover, Valenti never testified that he licensed the NERO Marks from the Iveys; instead, he confirmed that he "bought a network of licenses from Mr. Ford Ivey . . . [and] took over servicing those licenses." Dkt. 86-2 at 201. Even Ford Ivey declared in a 2019 affidavit that "[c]irca 1998, [he], on behalf of NERO International, Inc., sold the trademark 'NERO' to Nero International Holding Co., Inc." Dkt. 87-2 at 26.

In light of the undisputed evidence, no reasonable jury could find that Valenti, on behalf of NIHC, did not purchase the Iveys' company and the NERO Marks.

### ii.  Abandonment

Secondly, Defendants argue that Plaintiffs abandoned the NERO Marks when NIHC I dissolved in 2002 (or alternatively, when NIHC II dissolved in 2011). The Court finds that NIHC's dissolution and its nonuse of the NERO Marks for six years constitute prima facie evidence of abandonment by NIHC. Between 2011 (when NIHC II was dissolved) and 2017 (when NIHC I was reinstated), there was no New York corporation by the name of "NERO International Holding Co., Inc." in existence. During this six-year period, Valenti executed license agreements listing the company name "NERO Live Adventures Games, LLC" as the licensor -- but not NIHC. See, e.g., Dkts. 83-33, 83-34. Plaintiffs did not produce any license agreements that NIHC signed as licensor during this time. In fact, NIHC's financial and tax records indicate that NIHC did not make any revenues, including licensing revenues, from 2011 to 2017. See Dkt. 92-4 at 36. Even the eventual reinstatement of NIHC I in 2017 does not cure the fact that the company did not enter any license agreements under its own name during the six years prior. The record before the Court shows that Defendants have adduced prima facie evidence of NIHC's discontinued use and abandonment of the NERO Marks. See Micromuse, 304 F. Supp. 2d at 217 ("[W]hen a company ceases business to a point in time when there is no longer an association between the company and the mark, an abandonment occurs for the obvious reason that the association of the mark

with the company no longer serves to dispel consumer confusion over the origin of goods and services.").

Next, the Court must examine the record for evidence of Plaintiffs' intent to resume use of the NERO Marks, including "evidence with respect to what activities [Plaintiffs] engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990). In particular, an intent to resume use can be shown by continuing efforts to license a mark, which can be sufficient "to rebut a prima facie case of abandonment." Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 956 (7th Cir. 1992), cert. denied, 507 U.S. 1042 (1993). It is undisputed that Valenti executed license agreements and collected royalties on behalf of related companies that he formed, specifically NIHC I, NIHC II, and NLAG. The Lanham Act defines a "related company" as any person or entity "whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. Under the "related companies" doctrine, "[w]here a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration." Id. § 1055. Thus, the license agreements in

23

which NIHC I, NIHC II, and NLAG were listed as licensors inure to Valenti's benefit and potentially demonstrate his continuous use of the marks from 1998 to the present day. Defendants have failed to show by clear and convincing evidence that Valenti had no intent to resume use of the NERO Marks.

At summary judgment, Plaintiffs did not submit any NERO chapter license agreements dated between 2013 and 2020 that Valenti executed on behalf of himself or one of his companies. However, Plaintiffs submitted a PayPal payment log showing that Valenti continued to receive royalties from NERO chapters every year. See Dkt. 83-13. Thus, the Court finds that a jury question exists as to whether Valenti continued use of the NERO Marks or abandoned them during this period. Valenti may have fiddled while his corporations burned, but Valenti's use (or abandonment) of the NERO Marks remains a disputed issue of fact.

### iii.  Valenti's Stake in NIHC

Finally, the parties disagree as to whether Valenti was the sole shareholder of NIHC. According to Defendants, Valenti sold shares of NIHC over the years, and therefore the "only way for Mr. Valenti to have obtained [trademark] rights was to have those rights assigned to him by [NIHC] before its dissolution." Dkt. 92 at 12. Plaintiffs aver that because Valenti was the sole shareholder of NIHC, the NERO Marks "traveled" with Valenti without

24

the need for any written or formal trademark assignments. Dkt. 82 at 8-9.

Once again, the record reflects disputed facts. On August 4, 2006, Valenti sent an email to NERO chapter owners stating that he had sold part of his company:

> I have indeed sold a good percentage of the company in order to raise funds over the last 8 years. Selling parts of the company has always been my plan, and I continue to take on private investors and worker investors in the company. NERO International continues to distribute stock to individuals who the shareholder majority votes has gone the extra mile. . . . A number of people have bought NERO shares and there are a few who are still buying it.

Dkt. 92-1 at 130. In addition, an individual named Matthew Pearson testified in an affidavit that "[o]n March 6, 2008, [he] entered into an Agreement . . . with Joseph Valenti regarding [NIHC]," claiming that under this agreement, he "earned 4% of the total stock of [NIHC]." Dkt. 86-3 at 155-56. Pearson later testified that he never received any shares in NIHC. Dkt. 97-2 at 9.

Defendants have failed to produce any actual agreements or stock transfer documents showing that individuals (other than Valenti) own shares in NIHC. Plaintiffs submitted NIHC's stock transfer ledgers and stock certificates purportedly showing that Valenti is and has been the sole shareholder of NIHC. Dkt. 97-1 at 17-59. Valenti explained that although in the past he has offered company stock to individuals who have loaned him money, he has never actually sold shares to anyone. In a 2022 deposition, Valenti

maintained that he continues to be the only shareholder of NIHC. See Dkt. 97-2 at 14 (Q: "Do you have any shareholders?" A: "Just me.").

While there exists sufficient evidence on both sides to create a disputed fact, no individual has intervened claiming to be a shareholder, nor have Defendants cited to any caselaw stating that a co-owner of trademark cannot bring an action of infringement. The Court could find none. Thus, the issue is not a bar to suit.

In sum, the Court finds that there is a factual dispute as to whether Valenti continued use or abandoned the NERO Marks.[9] Therefore, the parties' cross-motions for summary judgment on Plaintiffs' federal trademark infringement claims with respect to the NERO trademarks are **DENIED**.[10]

### 3. The RAVENHOLT Mark

The Massachusetts NERO chapter is known as "Ravenholt," which is the name of a fictitious town or "duchy" in the game. Plaintiffs contend they are the valid owners of the RAVENHOLT mark because all uses of the mark since 1998 by Plaintiffs' licensees (i.e.,

---

[9] Bearden also argues that Plaintiffs' ownership claims are barred by the doctrine of unclean hands and/or inequitable conduct, based on the allegation that Plaintiffs fraudulently induced Bearden into entering a license agreement. Dkt. 86-1 at 15-16. The Court addresses the claims of fraudulent inducement infra, and for the same reasons, declines to grant summary judgment on these affirmative defenses.

[10] Counts I & II of the FAC (Dkt. 46) and Count I of Plaintiffs' Answer and Counterclaims (Dkt. 33).

the Iveys, Morris, and Tyler) inured to Plaintiffs' benefit. See Dkt. 82 at 10-11 (citing McCarthy § 18:46). However, Plaintiffs have not demonstrated that they have ownership rights in the RAVENHOLT mark. Neither the Iveys nor Valenti applied to register RAVENHOLT as a trademark. Moreover, Plaintiffs never licensed the RAVENHOLT mark. The license agreements executed between Plaintiffs and chapter owners, such as Morris and Tyler, typically included the following provision that only identified the NERO Marks, but not the RAVENHOLT mark:

> Under the License Agreement, Licenser grants to Licensee the right to operate a facility under the service mark NERO, New England Role-playing Organization, and NERO GAME SYSTEM.

See, e.g., Dkt. 83-17 at 3. No reasonable jury could find that Plaintiffs owned, used, or licensed the RAVENHOLT mark. Tyler and NEROtix's motion for summary judgment on Plaintiffs' trademark infringement claims with respect to the RAVENHOLT mark is therefore **ALLOWED**.[11]

### 4. State Common Law Claims

Plaintiffs also bring trademark infringement claims under Massachusetts and Missouri common law. "In Massachusetts, the test for common-law trademark infringement is the same as under the Lanham Act." L&P Bos. Operating, Inc. v. Window Nation, LLC, 626 F. Supp. 3d 461, 467 (D. Mass. 2022) (quoting United Oil Heat,

---

[11] Counts I & II of the FAC (Dkt. 46).

Inc. v. M.J. Meehan Excavating, Inc., 129 N.E.3d 856, 860 (Mass. Ct. App. 2019)); see Bos. Granite Exch., Inc. v. Greater Bos. Granite, LLC, No. 11-11898, 2012 WL 3776449, at *5 (D. Mass. Aug. 29, 2012) ("The standard for trademark infringement under Mass. Gen. Laws ch. 93A § 11 and 110H § 12, and the common law of trademark infringement is essentially the same as that under the Lanham Act."). The same is true under Missouri trademark common law. See Child.'s Factory, Inc. v. Benee's Toys, Inc., 160 F.3d 489, 491 n.2 (8th Cir. 1998) ("Because the Missouri common law action utilizes the same elements as an action under the Lanham Act, we need discuss only the alleged Lanham Act violation." (citation omitted)); Cmty. of Christ Copyright Corp. v. Devon Park Restoration, 683 F. Supp. 2d 1006, 1016 (W.D. Mo. 2010) ("The same facts that support a suit for federal trademark infringement support a suit for unfair competition and common law infringement under Missouri law."), aff'd, 634 F.3d 1005 (8th Cir. 2011).[12]

Thus, the Court's finding with regard to Plaintiffs' federal trademark infringement claims applies to Plaintiffs' state common law claims. Summary judgment on the trademark infringement claims under state common law with respect to the NERO Marks is inappropriate in light of the myriad of disputed facts relating to

---

[12] Plaintiffs do not need a registered trademark in Massachusetts or Missouri to bring a claim of trademark infringement under state common law. See L&P Bos. Operating, 626 F. Supp. 3d at 467; Cmty. of Christ, 683 F. Supp. 2d at 1016.

trademark abandonment.[13] However, for the same reasons as described above, Tyler and NEROtix's motion for summary judgment on Plaintiffs' trademark infringement and unfair competition claim under Massachusetts common law with respect to the RAVENHOLT mark is **ALLOWED**.[14]

### B. Cybersquatting

Plaintiffs allege that Defendants' registered domain names violate the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). Specifically, Plaintiffs assert that (1) Bearden's registration and use of the domain name "nerocentral.com", and (2) Tyler's acquisition and use of the domain name "neromass.com," both incorporate Plaintiffs' NERO mark and are confusingly similar to it. See Dkt. 33 at 30-31; Dkt. 46 at 17-18. All parties filed cross-motions for summary judgment on the cybersquatting claims.

### 1. Legal Standard for Cybersquatting

Congress passed the ACPA "primarily in an effort to stop 'cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money.'" N. Light Tech., Inc. v. N. Lights Club, 97

---

[13] Count VII of the FAC (Dkt. 46) and Counts VI & VII of Plaintiffs' Answer and Counterclaims (Dkt. 33).

[14] Count VII of the FAC (Dkt. 46). Plaintiffs did not bring a trademark infringement and unfair competition claim under Missouri common law against Tyler and NEROtix.

F. Supp. 2d 96, 115 (D. Mass. 2000) (quoting H.R. Rep. No. 106-412, at 5), aff'd, 236 F.3d 57 (1st Cir. 2001). To prevail on a claim under 15 U.S.C. § 1125(d), a plaintiff must show that "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." Bos. Sports Med., Inc. v. Bos. Sports Med. & Rsch. Inst., LLC, No. 21-11945, 2022 WL 2915670, at *5 (D. Mass. July 25, 2022) (quoting IvyMedia Corp. v. Take Tour, Inc., No. 12-11535, 2013 WL 5290551, at *11 (D. Mass. July 9, 2013)).

### 2. Analysis

Plaintiffs argue that "Defendants' domain names incorporate the NERO mark in their entirety and are therefore confusingly similar to it, and Defendants have continued to use the domain names with a bad faith intent to profit by advertising their competing LARPing events." Dkt. 82 at 21. In response, Defendants contend that Plaintiffs have not demonstrated that they own a distinctive mark, or that Defendants had a bad faith intent to profit. See Dkt. 92 at 16; Dkt. 86-1 at 17; Dkt. 88-1 at 18.

Setting aside the disputed issues of trademark ownership, distinctiveness, and likelihood of confusion, the Court concludes that Plaintiffs' cybersquatting claim is appropriate for summary

judgment because Plaintiffs have not shown sufficient evidence of
Bearden's or Tyler's bad faith intent to profit. The ACPA sets
forth nine factors courts consider in evaluating bad faith for a
cybersquatting claim. 15 U.S.C. §§ 1125(d)(1)(B)(i)(I)-(IX).[15]
Several of the factors weigh in Defendants' favor. For example,
both Bearden and Tyler made prior use of their domain names (i.e.,
"nerocentral" and "neromass," respectively) "in connection with

---

[15] The nine "bad faith" factors are: (1) the trademark or other
intellectual property rights of the person, if any, in the domain
name; (2) the extent to which the domain name consists of the legal
name of the person or a name that is otherwise commonly used to
identify that person; (3) the person's prior use, if any, of the
domain name in connection with the bona fide offering of any goods
or services; (4) the person's bona fide noncommercial or fair use
of the mark in a site accessible under the domain name; (5) the
person's intent to divert consumers from the mark owner's online
location to a site accessible under the domain name that could
harm the goodwill represented by the mark, either for commercial
gain or with the intent to tarnish or disparage the mark, by
creating a likelihood of confusion as to the source, sponsorship,
affiliation, or endorsement of the site; (6) the person's offer to
transfer, sell, or otherwise assign the domain name to the mark
owner or any third party for financial gain without having used,
or having an intent to use, the domain name in the bona fide
offering of any goods or services, or the person's prior conduct
indicating a pattern of such conduct; (7) the person's provision
of material and misleading false contact information when applying
for the registration of the domain name, the person's intentional
failure to maintain accurate contact information, or the person's
prior conduct indicating a pattern of such conduct; (8) the
person's registration or acquisition of multiple domain names
which the person knows are identical or confusingly similar to
marks of others that are distinctive at the time of registration
of such domain names, or dilutive of famous marks of others that
are famous at the time of registration of such domain names,
without regard to the goods or services of the parties; and (9) the
extent to which the mark incorporated in the person's domain name
registration is or is not distinctive and famous within the meaning
of subsection (c) of this section.

the bona fide offering of" LARPing services (third factor). Before Plaintiffs terminated Defendants' licenses, Bearden and Tyler used their domain names for many years with Plaintiffs' consent. As Plaintiffs concede, "Defendant Bearden initially registered the domain name www.nerocentral.com with Plaintiffs' consent," as did Tyler when she "took over the domain name www.neromass.com when she bought the NERO Massachusetts chapter." Dkt. 82 at 21.

Moreover, no evidence exists of Bearden or Tyler selling their domain names to third parties for financial gain (sixth factor), or of Bearden providing false contact information when applying for domain name registration (seventh factor). There are also no allegations that Bearden or Tyler frequently or routinely registered or acquired multiple domain names that are known to be confusingly similar to other marks (eighth factor). The Court concludes that not only have Plaintiffs "failed to produce evidence of a bad faith intent, the available evidence generally points to the opposite conclusion." Xen, Inc. v. Citrix Sys., Inc., No. 11-09568, 2012 WL 5289609, at *7 (C.D. Cal. Oct. 25, 2012) (holding that mere knowledge of a trademark is insufficient for proving bad faith).

Given that Bearden and Tyler are not the type of "cybersquatters" that the ACPA intended to target, Defendants'

motions for summary judgment on Plaintiffs' cybersquatting claims are **ALLOWED**.[16]

### C. Trademark Cancellation

In addition to defending their own NERO Marks, Plaintiffs seek to cancel Defendants' registered trademarks: Bearden's mark "NERO NEW ENGLAND ROLEPLAYING ORGANIZATION" (Supp. Reg. No. 4,697,406), NERO World's mark "NERO" (Supp. Reg. No. 4,657,988), and Tyler's mark "RAVENHOLT" (Reg. No. 4,973,167). See Dkt. 33 at 27-30; Dkt. 46 at 14-16. The Lanham Act allows courts to cancel trademarks. In any action involving a registered mark, "the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

Plaintiffs seek cancellation under three theories: (1) Bearden's and NERO World's marks were not "used in commerce" at the time of filing; (2) there exists a likelihood of confusion between Bearden's and NERO World's registered marks and Plaintiffs' marks; and (3) Bearden and Tyler obtained their respective trademark registrations by fraud. All parties filed

---

[16] Count IV of Plaintiffs' Answer and Counterclaims (Dkt. 33); Count V of the FAC (Dkt. 46).

cross-motions for summary judgment on Plaintiffs' trademark cancellation claims.

### 1. Cancellation Due to Bearden's Nonuse

Plaintiffs argue that Bearden's and NERO World's trademark registrations should be cancelled due to nonuse of the marks at the time of filing, which would render the registrations <u>void ab initio</u>. Dkt. 82 at 13-14; see <u>Aycock Eng'g, Inc. v. Airflite, Inc.</u>, 560 F.3d 1350, 1357 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void ab initio."). For service marks such as the NERO Marks, the "use in commerce" requirement is satisfied when "(1) a mark is used or displayed in the sale or advertising of services and (2) either (i) the services are rendered in commerce or (ii) the services are rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services." <u>Aycock Eng'g</u>, 560 F.3d at 1357 (cleaned up). The Federal Circuit has held that actual provision of services is required to constitute use in commerce. See <u>Couture v. Playdom, Inc.</u>, 778 F.3d 1379, 1382 (Fed. Cir. 2015).

Here, the relevant time of filing was approximately 2014. Bearden filed an application for the mark NERO NEW ENGLAND ROLEPLAYING ORGANIZATION on January 31, 2014. A few months later,

Bearden filed a separate application for the mark NERO on May 13, 2014, and then assigned that mark to NERO World in September 2015.[17]

From 2006 to 2009, Bearden ran NERO events through a license agreement with NIHC, paying 7% of his gross income in royalties to NIHC. Bearden testified that from 2010 to 2014, he "offered NERO games through what [he] believed was [his] NERO license but ran few if any because the NERO games were unpopular in the area because many were afraid that Joseph Valenti would sue them if they participated in a NERO game." Dkt. 86-3 at 26; see also Dkt. 84-8 at 19-20. Bearden also testified that during this period, instead of "wasting" time, he "create[d] resources" and "buil[t] props." Dkt. 84-1 at 33.

The Court finds that there is no evidence in the record showing that Bearden rendered actual services under the NERO Marks to customers at the time of his trademark application filing in 2014. Bearden himself concedes that he made "no revenues from use of either mark" during a seven-year period spanning from 2010 to 2017. Although it is undisputed that Bearden offered to run NERO games to intended customers, the sole act of offering is insufficient to satisfy the "rendered in commerce" requirement.

---

[17] Bearden's registrations for the NERO Marks are registered on the Supplemental Register. An application to register on the Supplemental Register must "specify that the mark has been in use in commerce." McCarthy § 19:34. In addition, "a supplemental registration is subject to a cancellation proceeding." Id. § 19:41.

See <u>Couture</u>, 778 F.3d at 1382 ("The Board in this case and the leading treatise on trademarks also agree that rendering services requires actual provision of services."); <u>Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco</u>, 329 F.3d 359, 361–66 (4th Cir. 2003) (holding that advertising activities were insufficient to establish use in commerce of a service mark absent evidence of actual bookings). Thus, Plaintiffs' motion for summary judgment on their claim for cancellation due to nonuse of Bearden's mark "NERO NEW ENGLAND ROLEPLAYING ORGANIZATION" (Supp. Reg. No. 4,697,406) and NERO World's mark "NERO" (Supp. Reg. No. 4,657,988) is **ALLOWED**.[18]

### 2. Cancellation Due to Tyler's Fraudulent Procurement

Plaintiffs also seek to cancel Tyler's registered RAVENHOLT mark based on the allegation that the mark was fraudulently procured from the USPTO. According to Plaintiffs, Tyler filed false declarations with the USPTO stating that she had no knowledge of other individuals or entities with the right to use this mark. <u>See</u> Dkt. 82 at 17–18.

The Lanham Act provides that any "person who shall procure registration in the Patent and Trademark Office of a mark by a

---

[18] Count III of Plaintiffs' Answer and Counterclaims (Dkt. 33). Because Bearden's and NERO World's registrations are cancelled due to nonuse, the Court will not address Plaintiffs' other arguments for cancellation of these registrations, namely likelihood of confusion and fraudulent procurement. <u>See</u> Dkt. 82 at 15–17.

false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof." 15 U.S.C. § 1120. "In order to establish a claim of fraud in the procurement of a federal registration, plaintiff must prove the following by clear and convincing evidence: (1) that defendant made a false representation to the PTO regarding a material fact; (2) that defendant knew that the representation was false; (3) that defendant intended to induce the PTO to act in reliance on the misrepresentation; and (4) the PTO was thereby deceived into registering the mark." SoClean, Inc. v. Sunset Healthcare Sols., Inc., 554 F. Supp. 3d 284, 295 (D. Mass. 2021) (quoting Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 484 F. Supp. 2d 205, 220 (D. Mass. 2007)), aff'd, 52 F.4th 1363 (1st Cir. 2022).

A showing of Tyler's mere awareness of prior use is not enough to prevail on a fraudulent procurement claim. "[A] trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO." In re Bose Corp., 580 F.3d 1240, 1245 (Fed. Cir. 2009); see also Money Store v. Harriscorp Fin., Inc., 689 F.2d 666, 670 (7th Cir. 1982) ("Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark.").

Plaintiffs have not proven by clear and convincing evidence that Tyler made a knowingly false statement to the USPTO. As explained above, there is no evidence that Plaintiffs ever owned or made prior use of the RAVENHOLT mark. Thus, no reasonable juror could find that Tyler believed Plaintiffs were using the RAVENHOLT mark when she filed her trademark application in 2015. Additionally, no reasonable juror could find that Tyler made a false representation or misled the USPTO by filing a declaration of use, instead of a declaration of excusable non-use, during the COVID pandemic. For these reasons, Tyler and NEROtix's motion for summary judgment on Plaintiffs' claim for cancellation of Tyler's mark "RAVENHOLT" (Reg. No. 4,973,167) is **ALLOWED**.[19]

## II.   **The Copyright Dispute**

Valenti purports to own a valid and registered copyright in the 9th Edition NERO Rule Book. He alleges that Defendants infringed his copyright by "continuing to permit the download of an entire copy of the book from their websites" and releasing a revised rule book substantially similar to the 9th Edition NERO Rule Book. See Dkt. 82 at 22-23. All parties filed cross-motions for summary judgment on Plaintiffs' copyright infringement claims.

---

[19] Count IV of the FAC (Dkt. 46).

## A. Legal Standard for Copyright Infringement

"To establish copyright infringement, the plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Latin Am. Music Co. v. Media Power Grp., Inc., 705 F.3d 34, 38 (1st Cir. 2013) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). A federal copyright registration "constitutes prima facie evidence of ownership and originality of the work as a whole." Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005). To establish contributory copyright infringement, the plaintiff must prove that the defendant intentionally induced or encouraged direct infringement. Elsevier Ltd. v. Chitika, Inc., 826 F. Supp. 2d 398, 404 (D. Mass. 2011).

## B. Ownership of a Valid Copyright

The first element of a copyright infringement claim is ownership of a valid copyright. Valenti registered the copyright in the 9th Edition NERO Rule Book in September 2015, which constitutes prima facie evidence of ownership and originality. Johnson, 409 F.3d at 17. The 9th Edition is a derivative work, and "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). A copyright for a derivative work

"only protects the original elements contributed by the author of the derivative work." Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1112 (1st Cir. 1993). Thus, Valenti's copyright only protects the original elements contributed by Valenti and others in the process of revising and issuing the 9th Edition, and not the preexisting material from prior editions.

In addition, between 2017 to 2018, Valenti obtained copyright assignments from individuals who allegedly contributed to previous editions of the NERO Rule Book, including a few of the original NERO founders: Beth Griffin, Craig Walton, and Mark Ginnetty. See Dkt. 83-45 at 2, 16, 22. At a minimum, this establishes Valenti's right in a joint work, i.e., the underlying work from previous editions of the NERO Rule Book. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Co-authors to a joint work are similar to "tenants in common, with each co[-]owner having an independent right to use or license the use of a work." Greene v. Ablon, 794 F.3d 133, 155-56 (1st Cir. 2015) (quoting H.R. Rep. No. 94-1476, at 121 (1976)).

### C. Safe Harbor Provision

Defendants separately argue that Valenti's registration certificate for the 9th Edition NERO Rule Book should be

invalidated because it contained inaccurate information. Under the Copyright Act, a certificate of registration is valid:

> regardless of whether the certificate contains any inaccurate information, unless—
>> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
>> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). Where both conditions of § 411(b)(1) are met, courts are required to refer the copyright registration to the Register of Copyrights to advise whether "the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." Id. § 411(b)(2).

Defendants contend that "Valenti knowingly submitted a claim for copyright registration that he knew, or at least was willfully blind to the fact, that others were co-authors of the work." Dkt. 92 at 19. Plaintiffs respond by arguing that any inaccurate information in Valenti's copyright registration falls within the Copyright Act's safe harbor provision under 17 U.S.C. § 411(b)(1), which excuses inaccuracies based on good faith mistakes of fact or mistakes of law. Dkt. 82 at 26 (citing Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 595 U.S. 178, 184 (2022)).

At this stage, the Court declines to invalidate Valenti's copyright registration or issue a request for review by the Register of Copyrights. It is unclear from the record whether

Valenti had knowledge that information included in his application regarding authorship was inaccurate at the time he filed it in 2015. Valenti testified that he applied to register the copyright under his name "because it was [his] understanding that [he] acquired all copyright rights from Mr. Ivey in prior editions of the NERO Rule Books and that the 9th Edition of the NERO Rule Book was revised and produced under [his] supervision and direction and was therefore a work made for hire." Dkt. 83 at 29. Valenti stated that it was only a few years later when he discovered "that Mr. Ivey may not have obtained written copyright assignments from individuals who contributed to the NERO Rule Books and game content." Id. at 31. Although "[c]ircumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters, may [] lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information," Defendants have not met their evidentiary burden under § 411(b)(1). Unicolors, 595 U.S. at 187-88. Thus, a disputed issue of fact exists as to whether Valenti presented inaccurate information to the Copyright Office with knowledge of, or willful blindness to, its factual and legal inaccuracy.

### D. Copying of Constituent Elements

The second element as to whether Defendants engaged in "copying of constituent elements of the work that are original" is

a disputed issue appropriate for a trier of fact. Plaintiffs allege
that Defendants infringed the copyright in the 9th Edition by
"continuing to permit the download of an entire copy of the book
from their websites www.neromass.com and nero.world." Dkt. 82 at
22. In particular, Valenti testified that the 9th Edition became
available on the "neromass.com" website at a link that did not
exist prior to August 2017. See Dkt. 91-1 at 10, 38. In contrast,
Defendants contend that they were specifically instructed and
authorized by Valenti to place the 9th Edition NERO Rule Book on
their websites. See Dkt. 92 at 17. However, Defendants do not
allege that they had authorization to place the rule books on their
websites after their respective licenses had been terminated.

Plaintiffs also contend that NERO World infringed on
Valenti's copyright by releasing a rule book titled "NERO World
Classic Rulebook, 1st Edition" that allegedly has "remarkable
similarities" to the 9th Edition. Dkt. 82 at 23. NERO World does
not seem to dispute that the two rule books are substantially
similar. Even Jason Mote, the author of the NERO World Classic
Rulebook, testified that he used the 9th Edition NERO Rule Book as
a "reference" and was specifically tasked "to reimagine the
existing rules in [his] own words but keep the feel of the book
the same" as the 9th Edition NERO Rule Book. Dkt. 84-3 at 10.

Instead, NERO World argues that it obtained rights as a
co-author of the 9th Edition, and thus "cannot be an infringer of

its own work."[20] Dkt. 87-1 at 14. In October 2022, Michael Golosovker assigned his purported rights in the 9th Edition to NERO World. See Dkt. 86-2 at 205. NERO World contends that Golosovker contributed to the 9th Edition and is therefore a co-author, as supported by the fact that he is listed on the credits page (under the title "Edited and Compiled by"). See Dkt. 87-2 at 38. Golosovker also stated in his affidavit that "[t]he rules in the 9th edition were written primarily by me and David Epstein," along with three others, and that he "spent an enormous amount of time editing, rewording, and cleaning out things in the [8th Edition]." Id. at 32-33. Plaintiffs argue that Golosovker is not a co-author because "he simply revised the prevision edition to add pre-existing content" and had an understanding that "Valenti and his company would own any copyrights" in the 9th Edition. Dkt. 90 at 13. The Court finds there exists a disputed issue of fact as to Golosovker's

---

[20] Plaintiffs point out that NERO World has not pled co-authorship as a counterclaim in this action. See Dkt. 97 at 17. Although this may preclude NERO World from affirmatively seeking damages based on co-authorship, it may still assert co-authorship as a defense to copyright infringement. Warren Freedenfeld Assocs., Inc. v. McTigue, 531 F.3d 38, 48 (1st Cir. 2008) ("[N]o claim for copyright infringement lies" where parties "are joint authors (and, thus joint owners)."). Plaintiffs also argue that the co-authorship claim is time barred under 17 U.S.C. § 507(b). See Dkt. 97 at 16-17. However, § 507(b) provides that "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Here, NERO World is not seeking civil action or declaratory judgment for co-ownership; it is asserting a defense.

contributions to the 9th Edition and his understanding with regard to copyright ownership over the 9th Edition.

Thus, the parties' cross-motions for summary judgment on Plaintiffs' claims for copyright infringement are **DENIED**.[21]

## III.  <u>Fraudulent Inducement</u>

Defendants rest their counterclaims of fraudulent misrepresentation and/or fraudulent inducement on the premise that Plaintiffs knowingly and fraudulently represented to Defendants that they were "the rightful owners of intellectual property, including copyrights in the Rule Book and [NERO] trademarks." Dkt. 51 at 37; Dkt. 31 at 21. Defendants allege they relied on Plaintiffs' false representations, were induced into entering license agreements, and paid thousands in licensing fees over several years. Plaintiffs move for summary judgment in their favor on these claims.

### A. Legal Standard for Fraudulent Inducement

Under Massachusetts law, to prove fraudulent inducement, a plaintiff must show that: "(1) the statement was knowingly false, (2) defendants made the statement with the intent to deceive, (3) the statement was material, (4) plaintiff reasonably relied on the statement, and (5) plaintiff was injured as a result of its reliance." Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300,

---

[21] Count V of Plaintiffs' Answer and Counterclaims (Dkt. 33); Count VI of the FAC (Dkt. 46).

310 (1st Cir. 2022) (quoting <u>United States v. President & Fellows</u> <u>of Harvard Coll.</u>, 323 F. Supp. 2d 151, 199 (D. Mass. 2004)).[22] The First Circuit directs that "Massachusetts contract principles govern the evaluation of fraudulent inducement claims." <u>Delphi</u> <u>Corp. v. Litex, Inc.</u>, 394 F. Supp. 2d 331, 339 (D. Mass. 2005) (citing <u>Nash v. Trs. of Bos. Univ.</u>, 946 F.2d 960, 967 (1st Cir. 1991)).

**B. Analysis**

Plaintiffs insist that Valenti made no misrepresentations to Defendants because "Valenti had no discussions with Defendants about intellectual property ownership at the time they agreed to their licenses," and therefore "any information about intellectual property ownership was never material to a licensee's decision to sign a NERO license." Dkt. 82 at 19. In defense of their claim, Defendants allege that in 2006, Valenti induced Bearden into entering a contract with NIHC I by "falsely representing that the company existed and owned intellectual property it did not." Dkt. 92 at 16. They also allege that in 2009, when Tyler acquired NEROtix and Ravenholt, Valenti also fraudulently represented to Tyler that NIHC I was "a viable existing entity that held valid

---

[22] The parties do not dispute that Massachusetts law applies to Defendants' fraudulent inducement claims. <u>See</u> <u>Katz v. Pershing,</u> <u>LLC</u>, 672 F.3d 64, 72 (1st Cir. 2012) ("[Courts] are free to honor the reasonable understanding of the parties as to choice of law . . . ."). Nor do the parties argue whether the statute of limitations bars Defendants' fraudulent inducement counterclaims.

rights and continued to wrongfully demand payment of fees." Id. It is undisputed that NIHC I did not exist in 2006 nor in 2009, as the entity had been dissolved. But it is not clear from the record whether Valenti made material statements regarding NIHC I's existence, and whether such statements were made by Valenti with an intent to deceive. Thus, Plaintiffs' motions for summary judgment on Defendants' counterclaims for fraudulent misrepresentation and/or fraud in the inducement are **DENIED**.[23]

## IV.   Tortious Interference

Plaintiffs bring a claim of tortious interference with contract or business expectancy against Bearden and NERO World. Plaintiffs allege that Bearden, as a competitor of NERO, deliberately interfered with Plaintiffs' business, licensees, and chapter owners between 2015 and 2018 in order to recruit owners and players for Bearden's own game systems. According to Plaintiffs, Bearden's public announcement that Plaintiffs had no rights in the NERO Marks "induced some chapter owners to terminate their relationship with Plaintiffs." Dkt. 33 at 37. Bearden and NERO World both move for summary judgment on this claim.

### A. Legal Standard for Tortious Interference

Under Massachusetts law, a plaintiff asserting tortious interference with contract must show that: "(1) [the plaintiff]

---

[23] Count III of Bearden's Counterclaims (Dkt. 31); Count V of Tyler and NEROtix's Counterclaims (Dkt. 51).

had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (cleaned up) (quoting O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010)). Similarly, to prevail on a claim of tortious interference with advantageous business relationships, a plaintiff must show: (1) "a known advantageous relationship"; (2) "deliberate interference"; (3) "improper in motive or means"; and (4) "resulting economic harm." Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43 (1st Cir. 2011).[24]

**B. Analysis**

Plaintiffs contend Bearden knowingly interfered with Plaintiffs' business relationships, causing chapter owners to terminate their license agreements with Valenti. In January 2015, Bearden wrote an email directed to twenty to fifty NERO chapter owners, detailing Valenti's attempts to sue a former NERO owner and the dissolution of NIHC. Dkt. 83-36 at 2-3. Bearden suggests options for moving forward, including giving NERO back to Valenti or Ivey. Id. at 4-5. Bearden summarizes his email with the following statement:

---

[24] Parties do not dispute the application of Massachusetts law to the tortious interference claims. See Dkt. 86-1 at 19.

> In short, Joseph Valenti has been playing fast and loose
> with the rules of corporate property for the past five
> years in a way that seriously jeopardizes our legal
> rights. I am not sure what he has been trying to hide
> from whom, but the way he has handled it left the NERO
> community and the name exposed, and he has lost
> ownership. We have a decision to make about the future.

Id. at 2. In July 2018, Bearden posted to a Facebook group called

"NERO World Community Discussion," making similar statements:

> Joseph Valenti has never owned the NERO name . . . .
> With the trademark unprotected, I, as a chapter owner
> under NERO International Holding Co., Inc. filed claim
> to the trademark with the USPTO and it was granted. I
> contacted as many people who might validly own NERO
> chapters as possible to ask what they thought should be
> done with the name. Keep the name for themselves and
> form a company to use it, give the name to Joseph
> Valenti, or give the name to the original creator of
> NERO, Ford Ivey? Though a few wanted to form a company,
> the overwhelming majority asked to give the name to Ford
> Ivey. None said to give the name to Joseph Valenti.

Dkt. 83-37 at 2. Plaintiffs contend that these communications by

Bearden are evidence of "concerted efforts by Bearden to oust Mr.

Valenti from running NERO and have existing NERO chapter owners

migrate to NERO World." Dkt. 89 at 17.

Although Bearden's communications may constitute evidence of

knowing interference, Plaintiffs' tortious interference claim

ultimately fails because Plaintiffs "fail to identify any specific

contract, relationship or opportunity that was lost as a result of

[Bearden]'s conduct." Sensitech Inc. v. LimeStone FZE, 548 F. Supp.

3d 244, 258 (D. Mass. 2021), appeal dismissed, 2021 WL 9167828

(1st Cir. Oct. 18, 2021). In Plaintiffs' Answer and Counterclaims

(Dkt. 33), Plaintiffs provide two examples of NERO chapter owners who terminated their license agreements allegedly due to Bearden's interference. As a threshold matter, both examples are based on hearsay evidence likely inadmissible at trial, which cannot be considered on a motion for summary judgment. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

In one example, Lynn Taylor, the former owner of a NERO chapter in Georgia, stated in a forum post from 2009 that she was "one of the founding members of Heroic, having agreed to move my chapter over to the new system at the start of it." Dkt. 33-20 at 2. However, in the post she makes no mention of Bearden, nor does she explain any reasons for why she terminated her licensing agreement with Plaintiffs. In the second example, Steve Cecchin wrote an email in 2015 informing Valenti of his intentions not to reinstate his NERO chapter. Dkt. 33-21 at 2. However, in the email, Cecchin explained that his decision to terminate the business relationship was not due to Bearden, but because of uncertainty over who had rights to use the NERO Marks, in addition to financial considerations:

> I think you misunderstand my position with Joe Bearden. I'm not using that situation against you to re-start my chapter for a lower price . . . . Joe Bearden has a good case as to why he owns the trademark, and so does Joe Valenti. It is not clear in either direction who would

win. It's at the whim of the judge. Why would I pay you
any amount of money to re-instate my chapter, when you
could lose the lawsuit in three months, six months, or
a year and I lose my chapter again anyways? It is much
better for my community to change to another LARP system
than wait for the outcome of an extended lawsuit, not to
mention much cheaper.

Id. In their summary judgment briefs, Plaintiffs do not identify
any other contract or relationship that was lost due to Bearden's
"knowing interference." For these reasons, Bearden's and NERO
World's motions for summary judgment on Plaintiffs' claim for
tortious interference with contract or business expectancy are
**ALLOWED**.[25]

## SUMMARY

I rule as follows:

Summary judgment is granted in Plaintiffs' favor on their
claim that they purchased the NERO Marks from Ivey; however, there
remains a disputed issue as to their abandonment of the NERO Marks.

Summary judgment is granted in Plaintiffs' favor on their
cancellation claim for Bearden's and NERO World's registered
trademarks. Thus, Bearden's "NERO" and NERO World's "NERO NEW
ENGLAND ROLEPLAYING ORGANIZATION" registrations on the
Supplemental Register are cancelled.

Summary judgment is granted in Tyler's and NEROtix's favor on
Plaintiffs' trademark infringement and fraudulent procurement

---

[25] Count IX of Plaintiffs' Answer and Counterclaims (Dkt. 33).

claims with respect to the RAVENHOLT mark. Thus, Plaintiffs' claims involving the RAVENHOLT mark are dismissed.

Summary judgment is granted in Defendants' favor as to the cybersquatting and tortious interference claims. Accordingly, those claims are dismissed.

There are multiple disputed issues of fact with respect to Plaintiffs' copyright infringement claims and Defendants' fraudulent inducement counterclaims.

Therefore, the following claims will proceed to trial: Plaintiffs' trademark infringement claims as to the NERO Marks under federal and state law; Plaintiffs' copyright claims as to the 9th Edition NERO Rule Book; and Defendants' fraudulent inducement counterclaims.

## ORDER

In accordance with this memorandum, the Court hereby ORDERS:

(1) Tyler and NEROtix's motion for summary judgment on Plaintiffs' trademark infringement claims (Counts I and II of the FAC (Dkt. 46)) as to the RAVENHOLT trademark is **ALLOWED**.

(2) Tyler and NEROtix's motion for summary judgment on Plaintiffs' trademark infringement and unfair competition claim under Massachusetts common law (Count VII of the FAC (Dkt. 46)) with respect to the RAVENHOLT mark is **ALLOWED**.

(3) Defendants' motions for summary judgment on Plaintiffs' cybersquatting claims (Count IV of Plaintiffs' Answer and Counterclaims (Dkt. 33); Count V of the FAC (Dkt. 46)) are **ALLOWED**.

(4) Plaintiffs' motion for summary judgment on their claim for cancellation of Bearden's mark "NERO NEW ENGLAND ROLEPLAYING ORGANIZATION" (Supp. Reg. No. 4,697,406) and NERO World's mark "NERO" (Supp. Reg. No. 4,657,988) (Count III of Plaintiffs' Answer and Counterclaims (Dkt. 33)) is **ALLOWED**.

(5) Tyler and NEROtix's motion for summary judgment on Plaintiffs' claim for cancellation of Tyler's mark "RAVENHOLT" (Reg. No. 4,973,167) due to fraudulent procurement (Count IV of the FAC (Dkt. 46)) is **ALLOWED**.

(6) Bearden's and NERO World's motions for summary judgment on Plaintiffs' claim for tortious interference with contract or business expectancy (Count IX of Plaintiffs' Answer and Counterclaims (Dkt. 33)) are **ALLOWED**.

(7) All other motions or grounds for summary judgment are **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge